## TURNER v. PEOPLE'S FERRY CO.

*(Circuit Court, S. D. New York. July 15, 1884.*

**1. RIPARIAN RIGHTS—GRANT OF LANDS UNDER WATER.**

Exclusive riparian rights do not attach, as a matter of course, to a grant of lands under water. Whether they do so or not depends upon the express terms of the grant, or upon the intent of the parties as shown by prior use, by the object of the grant, or by other circumstances from which the intent may be inferred. In the absence of an express grant of the right of wharfage, and of any manifest intent to convey it, no exclusive right of wharfage passes as incident to a grant by the state of land under water, below high-water mark, in a harbor or navigable stream.

**2. SAME—INTERVENING STREET—NEW YORK ACT OF 1813.**

An intervening public street between private owners and the exterior line of the water front, prevents the acquisition of riparian rights by the owners on

the opposite side of the street; and the act of 1813 of the legislature of New York, in providing for laying out such an exterior street, and that the upland owners, on filling in the "intermediate spaces" should be owners of the lots so filled in, negatives any intention to confer riparian rights on such owners; the right of wharfage under said act being conditioned upon such owners' building the wharves as directed by the city.

3. SAME—WHARVES.

Where the city, under the legislative act of 1813, is entitled to the wharfage along the wharves built by it, its rights are exclusive, so far as is necessary to the full enjoyment of the use of the wharves and slips up to the line of the bulk-head, and any rights of the owners of lots along the bulk-head line are subordinate to those of the city or its lessees. The act of 1857, dispensing with any exterior street, did not enlarge the intent of the act of 1813 as respects any riparian rights in the owners of "intermediate spaces" filled in.

4. SAME—INJUNCTION—FERRY.

An injunction to restrain the prosecution of a work, like a new ferry, of great public convenience and utility, should not be granted at the instance of a private party alleging threatened damage, except his right and his injury be clear.

5. SAME—CASE STATED.

The defendant being about to erect new ferry structures, under authority from the state and the city, in the slip between Twenty-second and Twenty-third streets, East river, occupying nearly half the slip in width, at a distance of 145 feet from the bulk-head, far below the original high-water mark, on motion by plaintiff for injunction as obstructing his riparian rights along the bulk-head as hitherto exercised, *held*, that no exclusive riparian rights were established in the plaintiff, and that all the access which he could legally claim was still left him, and the injunction was denied.

Motion for Injunction to Prevent the Erection of Ferry Structures.

*Anderson & Howland*, for complainant.

*M. J. O'Brien* and *S. G. Clarke*, for defendant.

BROWN, J.   A motion is made for an injunction, *pendente lite,* to restrain the defendant from erecting its proposed ferry-rack and ferry-house along the southerly side of the Twenty-third street pier, in the slip between the wharves at Twenty-second street and Twenty-third street, East river.   The defendant was empowered by act of the legislature (Laws 1882, *c.* 193) to establish and operate a ferry from near Broadway, Brooklyn, across the East river to Twenty-third street, New York; and to acquire the necessary franchise therefor.   It subsequently acquired this franchise by purchase from the city of New York, at public auction, at a fixed yearly rental; and it also obtained a lease from the city of the Twenty-third street pier.   It has given bonds for the performance of all the various conditions of the lease, and of the franchise to operate the ferry, and has submitted its plans for the proposed ferry structures.   These plans have been approved by the proper city authorities; and, the defendant being about to begin the erection of these structures, the plaintiff seeks to enjoin the prosecution of the work on the ground that it will inflict irreparable injury on his alleged riparian rights as lessee of the premises along the bulk-head line at the head of the slip between Twenty-second and Twenty-third streets, by occupying nearly one-half of the slip at a distance of 145 feet directly in front of his bulk-head, thereby obstructing his business in the slip and on shore as at present conducted.   The proposed ferry

is, evidently, conducive to the public convenience and utility. No irregularities are suggested in the defendant's proceedings. I must assume, therefore, that the defendant has all the authority for the erection of these structures which the city or the state could confer; and a work thus authorized, and for the public benefit, should not be arrested at the instance of a private party, unless both his right and his injury be clear and certain. *Taylor* v. *Brookman*, 45 Barb. 106. I am not satisfied that the proposed structures would not leave the complainant in the enjoyment of all the rights which he can legally claim; and, without reference to the other points raised, the injunction, *pendente lite*, should, on that ground, be denied.

The plaintiff, in March, 1881, leased from the executors of John L. Brower certain premises between Twenty-second and Twenty-third streets for nine years from May 1, 1881, with the privilege of a renewal for ten years afterwards. The premises leased are described in the lease as bounded on the east "along the East river," and no reference is made in the lease to any bulk-head or wharf, or to any wharfage or riparian rights of any kind. The complainant hired the premises for the purposes of a coal-yard, expecting to receive and to deliver coal in boats moored along-side the bulk-head, as he has hitherto done. His affidavit states that at times he has had 20 canal-boats moored there at once. It appears, however, that prior to this lease the Pennsylvania Coal Company, a former lessee, had been accustomed to receive and to deliver coal there in like manner, using the bulk-head as a place of landing; and that this privilege enhances the rental value of the premises. It can scarcely be doubted that this use was contemplated by the lessor, as well as by the lessee, and that the terms were in reference to it. The complainant has sublet the northerly half of his premises to Clark & Allen, who have erected thereon a grain elevator, used in connection with the landing of boats at the bulk-head. It must be assumed, therefore, under such circumstances, that the lease to the complainant was intended to pass and did pass, as an incident thereto, whatever rights of wharfage the Brower estate held. *Huttemeier* v. *Albro*, 18 N. Y. 48; *Voorhees* v. *Burchard*, 55 N. Y. 98. It could not pass more. What their rights were, is the turning point.

The premises in question are far to the eastward of the line of 400 feet below low-water mark, and hence were formerly the property of the state, from which Brower's title to the lots and his rights of wharfage, if any, must be deduced. Omitting any reference to various acts and grants by the legislature and the city, which present some complications of title, and which are set forth in detail in the elaborately considered case of *Nott* v. *Thayer*, 2 Bosw. 10, the view most favorable to the title and rights of John L. Brower is that which deduces the complainants' alleged title from the act of the legislature of April 9, 1813, (Laws 1813, c. 86, §§ 220, 221,) in connection with the ordinance of the common council of December 31,

1856, laying out East street. By the act of 1813 (re-enacting the act of April 3, 1798) the legislature authorized the mayor, aldermen, etc., in brief, to lay out streets or wharves in front of those parts of the city which adjoin the East river, and from time to time to lengthen and extend said streets and wharves, to be completed at the expense of the proprietors of land adjoining or nearest; that such proprietors should fill up the spaces lying between their lots and such streets and wharves; and that upon so filling up and leveling the same they should become *owners of said intermediate spaces of ground in fee-simple.*

On December 31, 1856, the mayor, aldermen, etc., passed an ordinance establishing East street as an exterior street along this portion of the East river. Without stopping to inquire whether the ordinance, and the proceeding to acquire title under it, were valid under the act of 1813, but assuming them to be so, East street, as thus laid out, would cross Twenty-third street along the westerly line of Avenue C extended; and the same ordinance directed the existing numbered streets to be extended to East street, and that the proprietors of lands nearest to or opposite East street, as thus established, should make and complete the street and fill in the intermediate spaces by January 1, 1860. Before this ordinance was carried into effect, the work was arrested by the action of the harbor commissioners, appointed under the act of March 3, 1855, whose report, confirmed by act of the legislature, passed April 27, 1857, fixed the exterior bulk-head line in that vicinity, as it now exists, far within the proposed East street, and prohibited any solid filling in beyond this bulk-head line. This line is somewhat to the eastward of Tompkins street, (since discontinued,) and is between Avenue A and the extension of Avenue B. The Brower estate, it is claimed, acquired the fee of the land between Tompkins street and this bulk-head line of 1857, by filling in the "intermediate spaces," as provided by the act of 1813; but, as I must assume, it did not build either the Twenty-second street or the Twenty-third street piers, nor did it ever obtain any express grant from the city of the lots lying east of Tompkins street, or of any right of wharfage thereon. As incident to the land thus filled in, it is claimed that the Brower estate acquired riparian rights, and the rights of wharfage along the bulk-head. It is along this bulk-head, between Twenty-second and Twenty-third streets, that the complainant, as lessee, alleges that his riparian rights are threatened with injury.

As I have before said, none of the premises occupied by the complainant were any part of the original shore; they were a part of the harbor of the city of New York, and far below even low-water mark. Riparian rights do not attach, as a matter of course, to a grant of such lands under tide-water. A right of wharfage in such cases, as an incorporeal hereditament, must be derived either from the express terms of the grant, as in *Langdon* v. *Mayor, etc.,* 93 N. Y. 129, 150, and

in *Marshall* v. *Guion,* 11 N. Y. 461, or from the clear and manifest intent of the grant, as shown by the surrounding circumstances, such as prior use, or the declared intention of the grant. *Langdon* v. *The Mayor,* 93 N. Y. 129, 144; *Voorhees* v. *Burchard,* 55 N. Y. 98; *Huttermeier* v. *Albro,* 18 N. Y. 48. In the absence of an express grant of wharfage, or of such manifest intention, the city or the state, as the case may be, may make successive grants of its lands under water, each in front of the former, to different grantees, without any violation of the rights of either; and neither the first nor the last grantee will acquire any exclusive riparian privileges. None of such grantees are in any proper sense riparian owners at all; and riparian rights do not attach to such grants. *Weber* v. *Harbor Com'rs,* 18 Wall. 57, 67. In this state, where the common law on this subject prevails, and the state is owner of the soil below high-water mark, it was long since settled that a grant of such lands, even with a right to erect a wharf expressed in the grant, was by implication of law not an exclusive grant of wharfage rights; but that such rights, so long as they were not wholly cut off, were subject to be modified and abridged through other grants and other harbor regulations for the public benefit, without compensation. *Lansing* v. *Smith,* 8 Cow. 146; 4 Wend. 9, 22–24. And in the case of *Gould* v. *Hudson River R. Co.* 6 N. Y. 522, it was held by the court of appeals that an owner of upland along high-water line on the Hudson river had no exclusive riparian rights below that line, and hence sustained no legal damage from a railroad embankment built under a grant from the state which cut off his access to the river. This decision has never been questioned as a rule of property in this state. See *People* v. *Tibbetts,* 19 N. Y. 523, 528; *People* v. *Canal Appraisers,* 33 N. Y. 461, 487. It was cited, and its principles reaffirmed, in the recent case of *Langdon* v. *Mayor, etc., supra,* where the decision rested upon an express grant of wharfage rights.

As establishing a law of property, these decisions would be binding, I think, under section 721 of the United States Revised Statutes, as rules of decision in the federal courts, even if there was no authority in the supreme court on this subject. *Barney* v. *Keokuk,* 94 U. S. 338. But the decisions of the supreme court are of precisely the same effect. In *Yates* v. *Milwaukee,* 10 Wall. 504, (relied on by the complainant's counsel,) the rights of even a strictly riparian proprietor are declared to be "subject to such general rules and regulations as the legislature may see proper to impose for the protection of the rights of the public, whatever these rights may be." But in the subsequent case of *Weber* v. *Harbor Com'rs,* 18 Wall. 57, the supreme court held that a grant from the state of land under water in the harbor of San Francisco up to the exterior line of the bulk-head, where the city already had by law the control of the wharves and of wharfage rights, did not confer on the complainant any riparian rights as against the city; and his bill, filed to prevent such rights from being wholly cut off, was dismissed. That case, in all essential particulars,

was analogous to the present. It is true that the complainant there had built out a wharf for his own use. But the complainant here claims certain exclusive privileges in the slip beyond the bulk-head, which involves the same principle. It was not there proposed to abate the complainant's wharf as a nuisance, but to surround it by a larger wharf, and appropriate it to the public use. Had the complainant there been held to have had any right to exclusive privileges along his bulk-head, he would have been entitled to his injunction or to compensation. But the court say:

"The complainant is not the proprietor of any land bordering on the *shore* of the sea in any proper sense of the term. * * * There is no just foundation for his claim as riparian proprietor. He holds, as his predecessors took the premises, freed from any such appendant right. * * * They took whatever interest they obtained in subordination to the control by the city over the space immediately beyond the line of the water front, and the right of the state to regulate the construction of wharves and other improvements. * * * Having the power of removal, (of the complainant's wharf,) she could, without regard to the existence of the wharf, authorize improvements in the harbor, by the construction of which the use of the (complainant's) wharf would necessarily be destroyed." Pages 65–67.

The same principles were again affirmed and applied in *Barney* v. *Keokuk,* 94 U. S. 324, and in the recent case of *The Potomac Steamboat Co.* v. *Upper Potomac Steam-boat Co.* 109 U. S. 672, S. C. 3 Sup. Ct. Rep. 445, where it was held that a public street intervening between complainant's lots and the established river front, cuts off any exclusive riparian rights in the owner of the lots on the opposite side of the street, whether the fee of the street be in the public or not, the complainant not having any express grant of wharfage rights.

The federal decisions are in accord, therefore, with those of this state, so far as respects riparian rights attaching to grants of land under water in harbors or along navigable rivers. I find no case where any such exclusive rights are recognized, unless they are derived from the state or the city in express terms, or else by necessary implication from the circumstances of the grant. But if the act of 1813 and the ordinance of 1856 be looked to as sources of the grant of a right of wharfage, no allusion to wharfage or to any riparian rights, on the part of those filling in the intermediate spaces, is found there, except on condition of their having built the wharves or piers, which it is not here claimed that they did; and the whole tenor of both the act of 1813 and the ordinance of 1856 is manifestly inconsistent with the idea that the owners who should fill in the intermediate spaces were otherwise to acquire any right of wharfage, or even any title to lots to the water's edge, so as to become riparian owners at all. Under the ordinance of 1856, East street was to be an exterior street which would separate such proprietors from the water front, and under the act of 1813 an exterior street, like West street or South street, was also contemplated; but even had not such an exterior street been designed to intervene under the ordinance of

1856 and the act of 1813, to cut off any riparian ownership from those who might fill in the "intermediate spaces," still the act of 1813 itself manifestly confers on the city the right of wharfage on the wharves to be built out by it from the extended streets, and the control of wharfage rights. Subsequent acts have repeatedly confirmed this right. *Langdon* v. *The Mayor,* 93 N. Y. 144, 145. The wharves form the slips; and without the protection of the wharves, in the rapid tides of the East river, the bulk-heads themselves would be comparatively impracticable for use. The slips are so narrow, being not much above 200 feet wide, that the exercise of unrestricted rights of wharfage by an owner along the line of the bulkhead would, moreover, be plainly incompatible with the exercise of the same rights by the city upon its own wharves on each side of the slips. The slips formed by the wharves are appurtenant to and for the use and benefit of the wharves, and of the city which owns them, and of the public which is entitled to the full use of them; not for the use or benefit of the bulk-head owners. Without the full and, it may be, exclusive use of the slips, the full use of the wharves cannot be enjoyed. If an owner along the bulk-head line can lawfully moor six, eight, ten, or even twenty canal-boats at once along-side the bulk-head, tier upon tier, as it is said the complainant sometimes has done, he may thus occupy the whole slip and exclude the public from the wharves altogether, and the city from its rightful wharfage and use of the slip. On the other hand, the full enjoyment of the wharves by the city or its lessees for wharfage purposes, may, if the public needs require it, demand the use of the entire slip. There cannot exist, therefore, full riparian rights of wharfage in both parties at the same time. The act of 1813 leaves no possible doubt which of the two—the city which builds the wharves, or the owner who fills in intermediate spaces and thus becomes owner of the bulk-head lots—is intended to enjoy this right of wharfage. All that the act of 1813 gives to the latter is the title to the "intermediate spaces;" an exterior street, as I have said, being contemplated by that act, which would exclude him from the enjoyment of riparian rights; while the city is to take the benefit of the wharves which it builds, and with them the use of the slips for the purposes of wharfage. No intention to confer riparian rights on the owner of spaces filled in can be deduced from the act of 1857, which prevented the construction of the proposed exterior street.

As the estate of Brower, therefore, obtained no right of wharfage by the terms of any grant, nor by any intention of the city or state, from whom it derives title, it has not, in my judgment, any legal right, as against the city or its grantees, to convert the bulk-head into a wharf, and maintain it as such as a means of private emolument; nor even any proprietary right to the use of the slip adjoining the bulk-head as a place for landing its own boats, to the exclusion of any necessary use by the public under the city or its lessees. It may doubtless land boats there by sufferance, as any other citizen might

do; but it has no right to obstruct the use of the slip, or of any part of it, which may be required by the public in mooring boats along either the Twenty-second or Twenty-third street wharves up to the line of the bulk-head, nor to interfere with any other appropriate use of a wharf, such as a ferry landing, which the city and state may authorize.

This case differs from all others which have been cited in support of the injunction, in the fact that the complainant and those whom he represents have neither any title to the slip or to the land in front of the bulk-head, nor any express grant of a right of wharfage, nor any evidence of any intent by the state or city to grant such a right. The case of *Lansing* v. *Smith, supra,* as above observed, long since decided that even if wharfage had been granted, subsequent obstructions in front, necessary for the public convenience, were no grounds for a claim of damages, so long as access, though impaired, still remained. In the present case a basin of 145 feet long by the wharf will remain free along the upper part of the bulk-head; while the lower part, embracing more than one-half the complainant's frontage, will be completely open and unobstructed as before.

The papers before me do not show any legal rights in the complainant beyond this means of access still reserved to him by the proposed structures; and without referring to the other points raised, the motion should, upon the above ground, be denied.