86 So.2d 775 (1956)
TRUSTEES OF INTERNAL IMPROVEMENT FUND of the State of Florida, Appellants,
v.
E.N. CLAUGHTON et al., Appellees.
Supreme Court of Florida. En Banc.
March 28, 1956.
*776 Richard W. Ervin, Atty. Gen., Fred M. Burns, Asst. Atty. Gen., and Richard H. Hunt and Hunt, Salley & Roman, Miami, for appellants.
Ward & Ward, Miami, for appellees E.N. Claughton and wife.
*777 Lane, Muir, Wakefield, Frazier & Lane, Miami, for appellees A. Frank Katzentine and Ucola Katzentine, his wife, and Julio Sanchez and Willow Dean Sanchez, his wife.
John E. Cicero and Olavi M. Hendrickson, Miami, for appellee City of Miami.
Fuller Warren, Miami Beach, amicus curiae.
DREW, Chief Justice, and ROBERTS, Justice.
On June 20, 1916, the Trustees of the Internal Improvement Fund of the State of Florida sold a small island in Dade County and some of the submerged lands surrounding it to Ray G. Burlingame and his wife, Margaret R. Burlingame. On said date the deed conveying the same was prepared, drawn and executed by said Trustees. This property lay easterly from certain uplands owned at that time by Mary Brickell. Insisting that the title to the island and submerged lands was vested in her by virtue of her ownership of uplands along the shore of the mainland, Mary Brickell instituted a suit to enjoin the Trustees of the Internal Improvement Fund from delivering said deed to the Burlingames. In this litigation Mary Brickell attacked the validity of Chapter 6451, Acts of 1913 (now Sections 253.06-253.11, Florida Statutes 1951, F.S.A.), which vested in said Trustees title to certain islands, sand bars and banks located in the tidal waters of Dade and Palm Beach Counties under which Act the Trustees claimed the title to said lands and the right to sell the same to the Burlingames. The contentions of Mary Brickell were finally determined adversely to her by this Court in Brickell v. Trammell, 77 Fla. 544, 82 So. 221, on May 5, 1919. On July 7, 1919, the Trustees delivered the deed to the Burlingames, said deed reciting on its face that it had been prepared, drawn and executed June 20, 1916. The property conveyed was described in the deed as follows:
"That partially submerged tract or island lying in Biscayne Bay near the mouth of the Miami River, being more particularly described as follows:
"Commencing at a point which is the intersection of the north line of Eighteenth (18th) Street and the west line of Brickell Avenue, City of Miami, Florida, thence easterly in projection of the said line of said Eighteenth (18th) Street five hundred and fifty-five (555) feet to the high water mark of Biscayne Bay; thence easterly continuing in projection of said line of said Eighteenth (18th) Street four hundred and twenty (420) feet; thence north six hundred (600) feet; thence east thirty (30) feet to a point in Biscayne Bay, this point being the point of beginning; thence east one hundred and sixty (160) feet; thence S. sixty-five (65) degrees E (two hundred and fifty (250) feet; thence S eighteen (18) degrees E.) five hundred and eighty-five (585) feet; thence west three hundred and fifty (350) feet; thence N. eighteen (18) degrees west seven hundred (700) feet more or less, to the point first above mentioned, being the point of beginning; containing five (5) acres, more or less, lying and being in the County of Dade, in the State of Florida, a plat being hereto attached."
Following such description was this habendum clause:
"To Have And To Hold the above described property to the said Ray G. Burlingame and Margaret R. Burlingame and their heirs and assigns, forever, together with all riparian privileges including the right to bulkhead and fill-in the said described lands as contemplated and provided under the Laws of this State."
The following is the plat referred to in the foregoing deed:
*778 
*779 Between the time the property was first sold to Mr. and Mrs. Burlingame in 1916 and the delivery of the deed to the Burlingames in July, 1919, the Legislature had enacted Chapter 8305, Sp.Acts of 1919, which Act became effective June 2, 1919. This Special Act purported to grant to the City of Miami, Florida, certain submerged lands in Biscayne Bay "for municipal purposes only, all its right, title and interest, insofar as the same can be granted, * * * including water front and riparian rights, * * *." The area covered by the metes and bounds description in the foregoing Act encompassed the area described in the deed to Mr. and Mrs. Burlingame. The Act, however, provided:
"Nothing in this [Act] shall affect or be construed to apply to any Island or Islands within boundary lines above described.
"Sec. 2. That this grant shall not affect any other grant heretofore made to any individual or corporation and nothing herein shall be construed as depriving any riparian owner or proprietor of any rights under the laws of this State."
In the early part of the year following the delivery of the deed to Mr. and Mrs. Burlingame a permit was issued by the War Department to bulkhead and fill in the entire area conveyed to the Burlingames, which, with that portion of the island lying within the metes and bounds description, contained above 5 acres. No work was done under this permit and it expired on December 31, 1922. In April, 1923, a new permit was issued covering the same area as the original permit and some filling was done under that permit but the entire 5-acre area was not filled prior to the expiration date of that permit.
In April, 1925, E.J. Reed acquired title to the property described in the deed from the Trustees to the Burlingames and shortly thereafter secured a War Department permit to bulkhead and fill in, not only the original property but additional acreage surrounding it. Under this latter permit the original 5-acre parcel was filled in and bulkheaded. The actual fill did not extend beyond the original five-acre tract until in 1932, at which time bulkheads were built beyond said original area and a fill made behind such bulkhead. This fill was completed in 1932 and resulted in the creation of an island of 20.7 acres, which had substantially within its borders the original five-acre area conveyed by the Trustees to the Burlingames. Graphically, the following situation then existed:
*780 
It will be observed from the above sketch that the said 20.7 acres lie within a triangle created by the three channels shown thereon.
With reference to the fill made in 1932 (the fill which resulted in the creation of the island as now existing and as outlined in the above drawing) the events leading *781 up to and surrounding that action are pertinent and germane to the disposition of this cause. The Master who heard the evidence, related these facts (and they are not disputed in any material particular) as follows:
"In the latter part of 1929 and early 1930, during the height of the depression, the City of Miami became active in attempting to obtain a large appropriation from the United States for the deepening and widening of the Miami River. It was considered that this project would be of great benefit to the City as a much needed public improvement, to relieve the lack of employment and for other reasons mentioned in the resolutions of the City Commission adopted during that time.
"The 71st Congress made the appropriation ($800,000.00) on July 3, 1930, and authorized the Secretary of War to improve the Miami River with a view to securing a channel one hundred and fifty feet wide and fifteen feet deep for a distance from the mouth of three miles, thence one hundred and twenty-five feet wide and fifteen feet deep to a point four and one-eighth miles from the mouth, thence ninety feet wide and fifteen feet deep to a point five and one-half miles from the mouth; each section to have suitable side slopes, `Provided, that no expense shall be incurred by the United States for acquiring any lands needed for the purpose of this improvement; Provided, further, that local interests shall provide all needed spoil disposal areas.'
"Thereupon the City, having guaranteed that all lands required for the right-of-way and spoil areas for the above mentioned project would be furnished without cost to the United States (Resolution 7164, Intervenor's Exhibit #37) began casting about to acquire the necessary locations for the deposit of the spoil from the contemplated operations. Close-in areas were essential to eliminate the prohibitive expense of hauling the spoil out to sea. (Tr. 10 of 1-19-51.) At first the city selected as a spoil deposit area a large tract of submerged land claimed by the City under said Chapter 8305 [Sp.] Acts of 1919 lying opposite the City's Bay front Park. (Resolution 7165, Intervenor's Exhibit 38.) Some spoil was deposited there but violent objections by a great many citizens and public bodies to such use of that area impelled the City to look elsewhere for a spoil site. (Tr. 10 of 1-19-51 and Resolution 7370, Intervenor's Exhibit 40.)
"Burlingame Island by reason of its proximity to the dredging operations was a strategic site for spoil disposal.
"The City Commission prevailed on R.P. Clark the President of the Clark Dredging Company, which was part owner of the island to use the five acre island and the fifteen acres of bay bottom contiguous to the island as a site for the deposit of the spoil from the dredging operations. Application was made to the United States Engineers for permission to relocate the spoil area from the Bay Front Park site to Burlingame Island and its contiguous bay bottom. Consent to the change was granted by the United States Engineers on condition, however, that the substituted site be bulkheaded to prevent the spoil from running into the bay and blocking the channel to the Miami River entrance, it being anticipated and required that large quantities of material would be deposited on this location.
"It was then that the City petitioned R.P. Clark to cause to be bulkheaded the proposed spoil area. Clark consented and the City commission adopted Ordinance 7559, which among other things authorized the assignment to Clark of the outstanding City tax certificates on the island for the years 1929 and 1930 (together in the face amount of $3,690.00) and the payment to Clark of a sum of money equal to the amount of City taxes upon the island for 1931 and 1932, amounting together to $1,583.20.

*782 "The bulkheading was done under contract with the M.F. Comer Bridge & Foundation Company. The witness Edward B. Comer, president of the company, could not recall at this late date whether the bulkheading contract was between his company and the Clark Dredging Company (part owner of the island) or R.P. Clark (the president of Clark Dredging Company) personally. He testified that the bulkheading was paid for by one or the other of them and at a contract price of around $4.00 per lineal foot. (Tr. 8 of 1-19-51.) The bulkhead encompassed the 20.7 acre island as it presently exists. The lineal footage of the bulkhead is 4,546.28 feet. At $4.00 per lineal foot the cost of putting in this bulkhead must have amounted to the sum of $18,815.12 [sic]. The spoil from the dredging operations was deposited within this bulkhead and the 20.8 acre island was filled to its present height of five feet above mean low water. The new bulkhead constructed by the M.F. Comer Bridge & Foundation Company completely surrounds the original five-acre parcel (Tr. 18 of 1-19-51) and cuts it off entirely from access to the water for all practical purposes."
In January, 1937, A. Frank Katzentine and Julio Sanchez acquired title to the 20.7-acre island aforesaid. In November, 1943, Katzentine and Sanchez conveyed said 20.7-acre tract to E.N. Claughton. The description in the deed to Sanchez and Katzentine and in their deed to Claughton was:
"All of the Island commonly known as Burlingame Island, lying in Biscayne Bay, near the mouth of the Miami River, more particularly described as follows:"
thence followed a metes and bounds description of the 20.7 acres, concluding with the following language:
"Together With all riparian privileges, including the right to bulkhead and fill in said lands as contemplated and provided for under the laws of this State;"
Parenthetically, the 20.7-acre island has been carried on the tax books of both the City of Miami and the County of Dade as an island of that size since it was filled in in 1932. The owners have paid to said political subdivisions nearly $20,000 in taxes up to the time of the trial below. In litigation between said city and the owners in 1941, the city admitted that the title to all of said 20.7 acres was vested in the then owners, and that was the effect of the final decree in that cause to enjoin the sale of the island for taxes. This litigation, and its effect from the standpoint of res adjudicata or estoppel by judgment, on the question now before us, will be considered at greater length in a subsequent portion of this opinion.
In 1947, after Claughton acquired title to the island, he instituted this suit against the City of Miami and the Trustees of the Internal Improvement Fund. The suit sought a decree quieting title in him in the 20.7-acre island and decreeing that as the owner of said island he had the right to bulkhead along the inside of the three channels surrounding the island and fill in the same behind said bulkheads, thus enabling him to enlarge said island from 20.7 acres to a little more than 70 acres. He averred he had the right to do this under the provisions of Chapter 8537, Acts of 1921, commonly known as the Butler Act. Chapter 271, Florida Statutes 1951, F.S.A.
In its answer the City of Miami claimed title to all the property, except the original 5-acre tract, including the bottom lands between the three channels, under the 1919 Act heretofore referred to. Later in the litigation, however, the City released all claims it had to the property involved in this suit to the Trustees, so the City is no longer interested in the litigation as a claimant to the property in question.
The Trustees answered and filed a cross-complaint. The Trustees contend that the island and the surrounding bottom lands conveyed originally to the Burlingames are the only lands owned by the plaintiffs as successors in title to the original grantee Burlingame and that the additional 15 acres *783 of filled-in land and the title to the bottom lands lying inside the triangle formed by the three channels is vested in the Trustees. The Trustees further contend that Chapter 8305, Sp.Acts of 1919, and Chapter 11616, Acts of 1925, Ex.Sess. (the Acts granting certain bottom lands in Biscayne Bay to the City of Miami), are unconstitutional and void. The 1925 Act is not involved because it does not cover or affect the subject property. They further allege that under Chapter 6451, Acts of 1913, supra, now Sections 253.06 through 253.11, Florida Statutes 1951, F.S.A., and Chapter 7304, Acts of 1917, now Sections 253.11, through 253.15, Florida Statutes 1951, F.S.A. (to which we shall refer more fully hereafter), the Trustees acquired title to the property which they later conveyed to the Burlingames. They also contend that the right to fill in the tract conveyed to the Burlingames, to use the exact language of the answer, "was a special riparian right" and limited to the 5-acre tract; they say that no right existed in the Burlingames or their successors in title to fill beyond the boundaries of said tract and that the lands created by fill beyond said 5-acre tract as well as the bottom lands beyond that and to the three channels are now and have been since 1913 the property of the Trustees. They pray that the court quiet title in them (said Trustees) to all of said island beyond the boundaries of the original 5-acre tract and that the plaintiff Claughton be decreed to have no right, title or interest to said filled-in lands aforesaid or any of the low or submerged lands lying inside the triangle formed by the three channels aforesaid.
More than three years after the complaint was filed and after the issues were made up by the original parties to the litigation, Katzentine and Sanchez and their spouses were allowed to intervene as former owners who warranted the title to said lands in their conveyance to Claughton, and filed their bill to quiet title to said property. The prayer of the complaint of Katzentine and Sanchez is, in part:
"2. That this Court find and decree that said deed from the Trustees of the Internal Improvement Fund of the State of Florida, to Ray G. Burlingame and Margaret R. Burlingame (Exhibit `C' hereof) vested title to the land therein described in said grantees together with all riparian privileges thereunto belonging or in anywise appertaining and that said riparian privileges included the right and easement to bulkhead and fill in said land and the submerged lands contiguous thereto out to the limits of said island as presently constituted and described in paragraph I of this bill of complaint and that upon the completion of said bulkheading and filling in the title to all of said island described in said paragraph I became vested in fee simple in the predecessors in title to the plaintiffs, A. Frank Katzentine and Julio Sanchez, * * *
"6. That this Court find and decree that the defendant Trustees of the Internal Improvement Fund of the State of Florida are estopped to deny the superiority of the title of the plaintiffs A. Frank Katzentine and Julio Sanchez as of the date of the said deeds from Katzentine and Sanchez to Claughton (Exhibits "A" and "B" hereto attached) as to any part of the island as presently constituted and described in paragraph I of said bill of complaint.
"7. That this Court find and decree that neither the defendant Trustees of the Internal Improvement Fund of the State of Florida nor the defendant City of Miami had any right, title, interest, claim or demand of any nature whatsoever in or to the said island as presently constituted and described in paragraph I of said bill of complaint, or any part thereof, at the time of the execution and delivery of the said warranty deeds from the plaintiffs Katzentine and Sanchez to the said E.N. Claughton (Exhibits "A" and "B" hereto attached)."
The intervenors, it will be noted, pray for substantially the same relief as Claughton but eliminate from their prayer any reference to the low and submerged lands beyond the 20.7-acre filled in island.
*784 On the issues thus made by the original parties and the intervenors, considerable evidence was taken and voluminous exhibits were filed. The Master, in his exhaustive report, concluded inter alia that Chapter 8305, Sp.Acts of 1919, and Chapter 11616, Acts of 1925, Ex.Sess., the Acts under which the City claimed title to the submerged lands, supra, (the 1925 Act as we have heretofore stated, is not involved) were valid but that the City of Miami was estopped from questioning the title to the 20.7 acres because of the facts heretofore set forth. He further concluded that the Riparian Rights Acts of 1856, amended by and referred to in the Butler Bill and now Chapter 271, Florida Statutes 1951, F.S.A., or similar statutes, do not apply to lands sold by the Trustees under the authority of Chapter 6451, Acts of 1913 (now Sections 253.06-253.11, Florida Statutes 1951, F.S.A.) or Chapter 7304, Acts of 1917 (now Sections 253.12-253.15, Florida Statutes 1951, F.S.A.) and that purchasers of such land are limited to the right to bulkhead and fill in the same as provided by Chapter 4370, Acts of 1895 (now Chapter 309, Florida Statutes 1951, F.S.A.).
The Master also held that Claughton had no right, title or interest, claim or demand in the submerged lands inside the three channels but outside the filled in island of 20.7 acres, except the common-law riparian rights of, among others, ingress and egress, navigation, commerce and fishing, and such rights as might be acquired by accretion, reliction, etc. He recommended the entry of an appropriate decree.
All the parties, except the City of Miami, which had quitclaimed its interest in said lands to the Trustees, filed exceptions to the Master's report, all of which were overruled by the learned Chancellor. The decree entered by the Chancellor confirmed the findings of the Master in all respects but one. He found the Acts vesting title in Miami valid and constitutional; held the City and Trustees were estopped to question the title of Claughton or the intervenors to the land outside the original 5-acre grant but inside the face of the sea wall (bulkhead) consisting of 15 acres; quieted and confirmed title of Claughton in Burlingame Island and dismissed the cross-complaint of the Trustees to the extent that it sought to quiet title to the land outside the original 5-acre grant.
With reference, however, to the Master's conclusions that the plaintiff Claughton had not right, title, interest, claim or demand, etc., to the low submerged lands between Burlingame Island and the three channels aforesaid, the Chancellor held:
"8. With respect to the fifty-some odd acres of submerged land lying outside the said 20.7 acre Burlingame Island: There is not sufficient evidence in the record for the Court to determine the depths of water over said lands, or whether such lands slope gradually from the island to the government channels without intervening irregularities or obstructions or whether such lands should be classified as sand bars or shallow banks or fall within any other of the classifications required to vest title to such lands in the Trustees of the Interval Improvement Fund under F.S. §§ 253.06 or 253.12 [F.S.A.]. The Court is of the opinion that neither Chapter 8537, Acts of 1921 (`Butler Bill') nor the riparian Act of 1941 (F.S. § 271.01 [F.S.A.]) as carried forward, should be construed to permit owners of lands purchased from the Trustees of the Internal Improvement Fund pursuant to Chapter 6451, Acts of 1913 (F.S. §§ 253.06-253.11[F.S.A.]) or Chapter 7304, Acts of 1917 (F.S. §§ 253.12-253.15 [F.S.A.]) to bulkhead, fill in and acquire title to lands abutting their holdings of the classifications mentioned in Chapters 6451 and 7305, and that the bulkheading and filling in rights of such purchasers are limited to the privileges granted by F.S. § 309.01 [F.S.A.]. However, the Court is also of the opinion that the benefits of the Butler Bill and F.S. § 271.01 [F.S.A.] as extended, attach to lands purchased from the Trustees under F.S. § 253.06 or § 253.12 [F.S.A.] which abut lands of `sovereignty land' classification. The record of this case does not *785 disclose whether the submerged lands surrounding Burlingame Island are of sovereignty land classification or are of the classification specified in Chapter 6451 Acts of 1913 or Chapter 7304 Acts of 1917, and until the nature of these submerged lands is made apparent the Court is unable to decide the issues raised by the Claughtons or the Trustees in their suit with respect to the title to such submerged lands.
"Accordingly:
"9. The Claughton bill as amended and the cross-complaints of the Trustees of the Internal Improvement Fund of the State of Florida in so far as the same seek to quiet the title to the lands lying outside the limits of the 20.7 acre Burlingame Island are dismissed without prejudice."
From this decree both the Trustees and the intervenors appealed and the original plaintiff Claughton filed cross-assignments of error. To these alleged errors we now direct our attention.
We first consider the assertion by the Trustees in its answer that Chapter 8305, Sp. Acts of 1919, and Chapter 11616, Acts of 1925, Ex.Sess., (the acts granting certain bottom lands in Biscayne Bay to the City of Miami) are unconstitutional and void. While this position is assumed by the Trustees in its answer to the complaint in this cause, in its supplemental memorandum upon the second rehearing the Trustees argue that "* * * the 1919 legislative grant to the City of Miami, being an unconditional and unrestricted grant of the State's title left no field for operation of the 1921 Riparian Act or `Butler Bill' wherein the State conditionally divested itself of its title in favor of riparian owners. As to the submerged lands involved in the instant case the State had no title of which it could be divested, conditionally or otherwise, at the time of passage of the 1921 act." It, therefore, appears that the Trustees have now abandoned the contention that the 1919 and 1925 acts are unconstitutional. Because of this and for the reason that our ultimate decision does not require us to pass upon the constitutionality of such acts, we refrain from doing so. Henderson v. Antonacci, Fla., 62 So.2d 5 and authorities cited there; Greene v. Alexander Film Co., Fla., 65 So.2d 53.
In Brickell v. Trammel, supra [77 Fla. 544, 82 So. 244], the origin of the small island lying partly within the 5 acres conveyed originally to the Burlingames is carefully traced and delineated. In that case it is recited, "In the digging of channel No. 2 a quantity of dirt was dug from the bottom of Biscayne and was thrown up on the east side of the said channel No. 2, and between said channels Nos. 1 and 2, forming a submerged tract of land which was gradually and imperceptibly added to by the action of the waters in Biscayne Bay and the Miami river, and still later, about four years ago, during a certain dredging operation in and about the mouth of the Miami river and in said channel No. 2, more dirt was dug from the bottom of Biscayne Bay and was thrown upon the said submerged tract of land lying immediately east of said channel No. 2 until a part of said submerged island extended out of the water and was not covered by high tide, and since that time this island has been gradually and imperceptibly added to by the action of the waters of Biscayne Bay and the Miami river, until it is now an island at high tide of approximately one acre, not as much being exposed at high tide as is described in the particular description above". [The above matter is quoted from the original document of the opinion filed by this court; explaining minor deviations from other reports.] And so it is that this island which appears on the exhibit attached to the deed from the Trustees to the Burlingames was built up from the bottom of Biscayne Bay, navigable tide waters in the State of Florida and, therefore, constituted sovereignty lands the title to which became vested in the State of Florida in trust for its people when the State was admitted to the Union on an equal footing with the other sovereign states.
During the period when Florida was a territory, it was the policy of the Federal *786 government to hold the title to lands under bodies of navigable waters and tide lands (lands covered and uncovered by the rise and fall of the tides) for the use of the public to inure to the State for the benefit of its people upon the formation of a state government. When Florida was admitted to the Union as a state, it became the owner by virtue of its sovereignty of all of such lands under navigable waters and tide lands within its territorial limits. Having acquired title to the land by virtue of its sovereignty and not by express grant or conveyance or patent, such lands became known and referred to as sovereignty lands. For a history of land grants and land titles in the State of Florida see Whitfield's Notes, Division 2, pages 228 to 240, appearing in Volume 3, Helpful and Useful Matter, Florida Statutes, 1941.
With reference to these sovereignty lands, it was held, prior to the enactment of the Butler Bill and prior to the acts of the Legislature vesting the title thereto in the Trustees of the Internal Improvement Fund of the State, that "The trust with which these lands are held by the state is governmental, and cannot be wholly alienated. For the purpose of enhancing and improving the rights and interests of the whole people, the state may by appropriate means grant to individuals the title to limited portions of the lands, or give limited privileges therein, but not so as to divert them from their proper uses, or so as to relieve the state of the control and regulation of the uses afforded by the land and waters." State ex rel. Ellis v. Gerbing, 56 Fla. 603, at page 612, 47 So. 353, at page 356, 22 L.R.A.,N.S., 337.
It is apparent from the record here that the island hereinabove referred to was not dealt with as such in the sale of the submerged lands by the Trustees to the Burlingames. This is obvious from the very fact that the tract of submerged lands conveyed to the Burlingames cut off the island at about its center. The Trustees were selling and the Burlingames were buying a portion of the bottom of navigable tide waters. The provision in the deed granting "all riparian privileges including the right of bulkhead and fill in said described lands as contemplated and provided under the laws of this State" vested in the purchaser the right to fill such submerged lands. The purchaser may not thereafter fill beyond the original lines without first obtaining the title thereto from the Trustees or the then owners of such submerged lands. We cannot ascribe to the Legislature, in the passage of either the Riparian Act of 1856 or the Butler Bill, the intention of authorizing one acquiring title to sovereignty lands from the Trustees to fill such lands beyond the boundaries conveyed without first acquiring the title to such additional lands created by such fill. The right to fill under the 1856 act and the Butler Bill attaches to what is often called uplands or lands other than sovereignty lands. See Holland v. Ft. Pierce Financing & Construction Co., 157 Fla. 649, 27 So.2d 76.
No authority need be cited for the proposition that a grant in derogation of sovereignty must be strictly construed in favor of the sovereign. And since the grant made by the Butler Bill, as construed by this Court, appears to have gone far beyond the original intention of the 1856 Riparian Rights Act  which was limited to filling in and bulkheading as an aid to commerce and navigation only  it is even more important that the grant therein made should not be extended beyond its terms. Despite the language of the Butler Bill that the grant therein was made "subject to any inalienable trust under which the state holds all submerged lands and water privileges within its boundaries," this Court knows, since everyone knows it, that the Butler Bill has operated to divest the State of its sovereign lands just as effectively as though a grant thereof without such limitation had been made to a riparian owner. And it would, in our opinion, do violence to the legislative intent to construe the Riparian Rights Act of 1856 and 1921 as applicable to the "islands, sand bars and shallow banks," the title to which was vested by the Legislature in the Trustees for the purpose of sale, Sec. 253.06 et seq., Florida Statutes 1953, F.S.A.
*787 In the first place, the grantees of such lands are not, in any true sense, "riparian proprietors" at all. The very nature of a grant of submerged land is such that it cannot be "actually bounded by, and extending to, high water mark on" the navigable stream, bay or harbor in which the submerged tract is located. As stated in Turner v. People's Ferry Co., C.C., 21 F. 90, 92, 93:
"* * * none of the premises occupied by the complainant were any part of the original shore; they were a part of the harbor of the city of New York, and far below even low-water mark. Riparian rights do not attach, as a matter of course, to a grant of such lands under tide-water. A right of wharfage in such cases, as an incorporeal hereditament, must be derived either from the express terms of the grant, [citations] or from the clear and manifest intent of the grant, as shown by the surrounding circumstances, such as prior use, or the declared intention of the grant [citations]. In the absence of an express grant of wharfage, or of such manifest intention, the city or the state, as the case may be, may make successive grants of its lands under water, each in front of the former, to different grantees, without any violation of the rights of either; and neither the first nor the last grantee will acquire any exclusive riparian privileges. None of such grantees are in any proper sense riparian owners at all; and riparian rights do not attach to such grants. Weber v. [Board of] Harbor Com'rs, 18 Wall. 57, 67 [21 L.Ed. 798]." (Emphasis is supplied.)
And there can be no difference in principle between a grant of such submerged land by the Trustees and a grant by them of a dredged-up island or a sand spit, which are ordinarily surrounded by water bottoms of the character we are here discussing.
It is our opinion, then, that the very nature of the "islands, sand bars and shallow banks", the title to which is vested in the Trustees under the 1913 and 1917 Acts, Chapters 6451 and 7304, now Sections 253.06 et seq., Florida Statutes 1953, F.S.A., refutes any claim by the grantees of the Trustees that they are "riparian" proprietors included within the grant of riparian rights made by the 1856 and 1921 Riparian Rights Acts, supra; and that, even though such Acts may be held to apply to islands the meander of which were established by the U.S. Government Survey and which in 1856 were owned by "a citizen of the United States or by the United States for public purposes" and which in 1921 were owned by "the United States or by any person, natural or artificial, or by any municipality, county or governmental corporation", they should not be construed to apply to "islands, sand bars and shallow banks" which are not of that character. It is suggested that this conclusion is not in accord with our holding in State ex rel. Buford v. City of Tampa, 88 Fla. 196, 102 So. 336, but we find this not to be so. In the Tampa case the islands involved were not and never had been owned by the Trustees of the Internal Improvement Fund by virtue of the so-called "Tidelands Acts", Chapter 6451, Acts 1913, and Chapter 7304, Acts 1917 (now appearing as Sections 253.06-253.15, Florida Statutes 1953, F.S.A.). Reference to the original file in the City of Tampa case shows that both of these islands were originally parts of the surveyed lands of the United States and passed into the hands of private owners, from whom they were subsequently purchased by the City (under statutory authority) and Davis. They were tracts of land "owned by a citizen of the United States or by the United States for public purposes," at the time of the enactment of the 1856 Riparian Rights Act, Chapter 791. The "island" with which we are here concerned is not of that character.
In the second place, it should be noted that there is no authority under the Butler Bill to fill in and bulkhead the submerged tidal lands granted to the Trustees under the Tidelands Acts. This is so because the Riparian Rights Act of 1921, c. 8537, the Butler Bill, expressly reserved such *788 "islands, sand bars and shallow banks" from the terms of the grant therein made. This it did by providing in Section 9 thereof that:
"Nothing in this Act contained shall affect or repeal Sections 1056 [through] 1064, of the Revised General Statutes. [Chapter 6451, Acts 1913 and Chapter 7304, Acts 1917]"
This reservation has been expressly recognized by this Court. In Holland v. Ft. Pierce Financing & Construction Co., supra, 27 So.2d at page 82, we said:
"Appellants [the Trustees and the State] also apparently contend that the submerged land in front of appellee's upland was of such character and formation as to come within the reservations of Chapter 8537, Acts 1921, and by Section 9 of said Act, the same being Sections 253.12 and 253.13, Florida Statutes 1941, F.S.A., and that the same constituted shallow banks and bars along the shore within the provisions of said sections.
"We do not agree with appellants in this contention. The proof shows without contradiction that the submerged land in front of appellee's property sloped gradually from zero at high water mark to a depth of approximately six feet at the bulkhead, without intervening irregularities or obstructions. This character of submerged land does not come within the classification of the cited sections and consequently was not within the reservation specified therein. On the contrary, it was of the very character intended by the Riparian Act to be qualifiedly vested in the upland owner." (Emphasis is supplied.)
This reservation was in line with the previous reservation of the swamp and overflowed lands from the grant made by the 1856 Riparian Rights Act, which reservation was again made in the Butler Bill. In other words, by the Riparian Rights Acts of 1856 and 1921, the Legislature, for a special and limited purpose, divested the state of the title to lands under the navigable waters therein specified which the state holds in its sovereign capacity in trust for the benefit of all the people. "Such lands are not held for purposes of sale or conversion into other values, or for reduction into several or individual ownership, but for the use of all the people of the state for purposes of navigation, commerce, fishing, and other useful purposes afforded by the waters thereon." Headnote, State ex rel. Ellis v. Gerbing, supra. But it did not intend to part with the title to the swamp and overflowed lands (the title to which had been vested in the Trustees in the year 1855 by Chapter 610, which Act also authorized the sale thereof) and the tidal lands, the title to which it had vested in the Trustees for the very purpose of "sale or conversion into other values [and] for reduction into several or individual ownership." And, by the same token, it did not intend that the riparian rights granted by the Butler Bill should apply to such lands.
It is true that the 1913 and 1917 Acts vesting title in the tidal lands in the Trustees specifically provided that "* * * if it shall appear that the sale of such islands and submerged lands and their ownership by private persons would interfere with the rights granted to riparian owners by the laws of Florida, * * * it shall be the duty of the Trustees to withdraw the said lands from sale. * * *" But since, by definition, the tidal lands which were the subject of the 1913 and 1917 grants, as originally enacted, were required to be "separated from the shore by a channel * * * not less than five feet deep at high tide," Section 253.06, Florida Statutes, F.S.A., and since this Court in Brickell v. Trammell, supra, which case confirmed in the Trustees the title to the five-acre tract of land here involved, as against the claim of the riparian owner that title vested in her under the Riparian Rights Acts of 1856,  held that a five-foot channel marked the limit of the riparian rights granted by that Act, there would seem to be no field for operation of this particular provision, insofar as the statutory riparian rights granted by the Butler Bill are concerned; there could not *789 possibly be an "interference" with such riparian rights, because no right existed. Cf. Brickell v. Trammell, supra.
Thus, the Legislature in enacting the 1913 and 1917 Acts, supra, must have intended only to preserve to riparian owners "The right of access to the property over the waters, the unobstructed view of the bay, and the enjoyment of the privileges of the waters incident to ownership of the bordering land * * *." Thiesen v. Gulf F. & A. Ry. Co., 75 Fla. 28, at page 78, 78 So. 491, at page 507, L.R.A. 1918E, 718. These are the common-law rights of a riparian owner which "* * * would not, in many cases, be exchanged for the price of an inland lot in the same vicinity." Ibid., and they are rights which the courts will protect. Compare Deering v. Martin, 95 Fla. 224, 247, 116 So. 54, in which it was held that the plaintiff stated a cause of action for interference with these rights by a proposed sale of submerged land allegedly owned and subject to sale by the Trustees under the provisions of the 1913 Act, supra.
We are cognizant of the provisions of the 1913 and 1917 Acts, which give to the Trustees' grantees of tidal lands the right to "bulkhead and fill in same, as provided by § 309.01, without, however, being required to connect the same with the shore or with a permanent wharf," Florida Statutes 1951, F.S.A., and which, it is contended, gives to such grantees the right to bulkhead and fill in up to the edge of the three channels here in question. But Section 309.01 merely provides the manner in which filling in and bulkheading should be done; and since the right to fill in and bulkhead was limited to the provisions of Section 309.01, under the familiar rule of expressio unis exclusion est, this particular section cannot be construed as a grant of anything other than a "special riparian right" to fill in and bulkhead the lands actually granted by the Trustees under the authority of the 1913 and 1917 Acts, which "special riparian right" was clearly necessary in order to reclaim these lands and turn them into useful property. It did not operate to bring such lands within the terms of the 1856 and 1921 Riparian Rights Acts, for the reasons hereinabove stated.
We hold, then, that the Riparian Rights Acts of 1856 and 1921 were not applicable to and granted no rights to the grantees of sovereignty lands from the Trustees of the Internal Improvement Fund, so that Claughton's predecessor in title had no right to fill in and bulkhead anything except the 5-acre tract actually conveyed to him by the Trustees.
It is contended by the appellants that applying the doctrine of estoppel against the Trustees or the City of Miami, as was done below, results in transferring vested rights held in trust for the public from the Trustees to the present owner of the original 5-acre tract; and that such result is clearly unjustified under the facts revealed by the record in this cause. We are wholly unable to agree with this contention. Our analysis of the record in this case from the beginning of the Brickell suit to the present time leads us inevitably to a conclusion exactly opposed to the contention of appellants. The facts constituting the basis for the estoppel are set forth in great detail in this opinion and it would serve no useful purpose to again delineate them. We shall proceed to examine the question of the appropriateness of invoking the doctrine of equitable estoppel in the instant case and shall first direct our attention to the basic question of whether such doctrine may in any instance be invoked against the State or its subdivisions.
It is said in 19 Am.Jur., Estoppel, paragraph 166:
"* * * an estoppel may arise against the state out of a transaction in which it acted in a governmental capacity if an estoppel is necessary to prevent loss to another and the perpetration of a fraud and if such estoppel will not impair the exercise of the sovereign powers of the state."
While the doctrine is not applied against the State or its subdivision as freely as against an individual, there is no doubt *790 that it may be invoked even against the exercise of governmental powers where it is necessary to prevent manifest injustice and wrongs to private individuals; provided that the restraint placed upon such governmental body to accomplish such purpose does not interfere with the exercise of governmental power. It is said for example, that, "A municipality is subject to the rules of estoppel in those cases where equity and justice require their application, and may be estopped under certain circumstances by its acts and conduct." 19 Am.Jur., Estoppel, paragraph 168. This Court long ago recognized that estoppel may be invoked against the State. Lee v. Lang, 140 Fla. 782, 192 So. 490, 493. In the last cited case we quoted from State ex rel. Landis v. Sovereign Camp, Woodmen of the World, 131 Fla. 867, 180 So. 33, as follows:
"`There has in times past existed some confusion in the law as to whether or not the doctrine of estoppel could be raised against the state, but as to the facts shown here, there seems no doubt that it may be done.'"
If any doubt at all remained that such doctrine could be invoked against the State or its subdivisions, that doubt was completely removed by the holding of this Court in Daniell v. Sherrill, Fla. 1950, 48 So.2d 736. Later in Trustees of Internal Improvement Fund v. Bass, Fla. 1953, 67 So.2d 433, we held that although the tax assessment against lands of the Trustees of the Internal Improvement Fund there involved was not authorized by law, the then owner had been in possession for more than 11 years under such deed issued by the State and "Under such a state of facts, even if his title is not good by adverse possession, the State is estopped to question it." The authority cited for such conclusion was Daniell v. Sherrill, supra.
In Florida Livestock Board v. Gladden, Fla. 1954, 76 So.2d 291, we again affirmed the principle that equitable estoppel may be invoked against the State when justified from the facts.
It is said in 19 Am.Jur., Estoppel, paragraph 34.
"Equitable estoppel or estoppel in pais is a term applied to a situation where, because of something which he has done or omitted to do, a party is denied the right to plead or prove an otherwise important fact. Any more exact or complete definition than this is difficult to formulate for the reason that an equitable estoppel rests largely on the facts and circumstances of the particular case, and consequently, any attempted definition usually amounts to no more than a declaration of an estoppel under those facts and circumstances. The cases themselves must be looked to and applied by way of analogy rather than rule."
In a footnote under that portion of his work dealing with the doctrine of equitable estoppel Dr. Pomeroy quotes at great length from the opinion of Perley, C.J. in the case of Horn v. Cole, 51 N.H. 287, 289, 12 Am. Rep. 111. The comments of Justice Perley so completely summarize our views of the doctrine as applied to the facts in this case that we, as did Dr. Pomeroy, quote from it at length:
"The ground on which a party is precluded from proving that his representations on which another has acted were false in, that to permit it would be contrary to equity and good conscience. * * *
* * * * * *
"* * * It thus appears that what has been called an equitable estoppel, and sometimes with less propriety an estoppel in pais, is properly and peculiarly a doctrine of equity, originally introduced there to prevent a party from taking a dishonest and unconscientious advantage of his strict legal rights,  though now with us, like many other doctrines of equity, habitually administered at law. * * *
"* * * It would have a tendency to mislead us in the present inquiry, as *791 there is reason to suspect that it has sometimes misled others, if we should confound this doctrine of equity with the legal estoppel by matter in pais. The equitable estoppel and legal estoppel agree indeed in this, that they both preclude from showing the truth in the individual case. The grounds, however, on which they do it are not only different, but directly opposite. The legal estoppel shuts out the truth, and also the equity and justice of the individual case, on account of the supposed paramount importance of rigorously enforcing a certain and unvarying maxim of the law. For reasons of general policy, a record is held to import incontrovertible verity, and for the same reason a party is not permitted to contradict his solemn admission by deed. And the same is equally true of legal estoppels by matter in pais. * * *
"* * * Legal estoppels exclude evidence of the truth and the equity of the particular case to support a strict rule of law, on grounds of public policy.
"Equitable estoppels are admitted on the exactly opposite ground of promoting the equity and justice of the individual case by preventing a party from asserting his rights under a general technical rule of law, when he has so conducted himself that it would be contrary to equity and good conscience for him to allege and prove the truth. The facts upon which equitable estoppels depend are usually proved by oral evidence; and the evidence should doubtless be carefully scrutinized, and be full and satisfactory, before it should be admitted to estop the party from showing the truth, especially in cases affecting the title to land. But where the facts are clearly proved, the maxim that estoppels are odious,  which was used in reference to legal estoppels, because they shut out the truth and justice of the case,  ought not to be applied to these equitable estoppels, as it has sometimes been, inadvertently as I think, from a supposed analogy with the legal estoppel by matter in pais, to which they have, in this respect, no resemblance whatever. * * *
"In this equitable estoppel, the party is forbidden to set up his legal title because he has so conducted himself that to do it would be contrary to equity and good conscience. As in other cases of fraud and dishonesty, the circumstances out of which the question may arise are of infinite variety; and, unless courts of law are willing to abdicate the duty of administering the equitable doctrine effectually in the suppression of fraud and dishonesty, the application of it cannot be confined within the limit of any narrow technical definition, such as will relieve courts from looking, as in other cases depending on fraud and dishonesty, to the circumstances of each individual case.
* * * * * *
"* * * the doctrine has not in equity been limited to cases where there was an actual intention to deceive. The cases are numerous where the party who was estopped by his declaration or his conduct to set up his legal title, was ignorant of it at the time, and of course could have had no actual intention to deceive by concealing his title. Yet, if the circumstances were such that he ought to have informed himself, it has been held to be contrary to equity and good conscience to set up his title, though he was in fact ignorant of it when he made the representation. * * * Nor is it necessary in equity that the intention should be to deceive any particular individual or individuals. If the representations are such, and made in such circumstances, that all persons interested in the subject have the right to rely on them as true, their truth cannot be denied by the party that has made them against any one who has trusted to them and acted on them."
Also Pomeroy Equity Jurisprudence, 5th Edition, paragraphs 801 to 821, as applied *792 in, among others, the following decisions of this Court: Coogler v. Rogers, 25 Fla. 853, 7 So. 391, 394; Hagan v. Ellis, 39 Fla. 463, 22 So. 727; Coram v. Palmer, 63 Fla. 116, 58 So. 721; Watkins v. Emmerson, 88 Fla. 86, 102 So. 10.
The doctrine of equitable estoppel was developed for the purpose of preventing such injustices as would inevitably result were we to agree with the contentions of the appellants concerning that portion of Burlingame Island lying outside the boundaries of the original 5-acre tract. Through all the years, the State and the City of Miami, the United States government acting through its War Department, and the various owners of Burlingame Island, have dealt with each other in the plain assumption that neither the State nor the City had any title whatever to, or right in, that portion of Burlingame Island constituting the present 20.7 acres. The application of the doctrine of equitable estoppel is so plainly indicated in this case that we do not find it necessary to pursue the question of whether the actions of the City in connection with the litigation over taxes and the consequent judgment in that case hereinbefore discussed amounts to res adjudicata, or estoppel by judgment. If it doesn't, such litigation and its results is evidence of most persuasive character to support the application of the doctrine of equitable estoppel. It is to be here observed that so far as the doctrine is concerned, it is equally applicable to both the City of Miami and the Trustees of the Internal Improvement Fund.
And so we hold that the application of the doctrine of equitable estoppel prevents the Trustees of the Internal Improvement Fund and the City of Miami from asserting their title to any of what now constitutes Burlingame Island as described herein as against the title of the appellees. Indeed, we think that in any case where, as here, the grantees from the Trustees of sovereignty lands have heretofore in good faith and with a bona fide belief of their right to do so under the law, expended money in enlarging, improving and developing their grants and the Trustees and the public have over a long period of time, as here, acquiesced in the ownership by the citizen of the filled-in tract not actually included in the grant, they cannot now be heard to question the ownership of the land as enlarged and developed. Compare Florida Livestock Board v. Gladden, supra.
All former opinions in this case are hereby withdrawn and receded from and shall not be published in the official reports.
Affirmed in part and reversed in part.
TERRELL, THOMAS, HOBSON, THORNAL and O'CONNELL, JJ., concur.