683 So.2d 144 (1996)
STATE of Florida, BOARD OF TRUSTEES OF the INTERNAL IMPROVEMENT TRUST FUND, Appellant,
v.
KEY WEST CONCH HARBOR, INC., Appellee.
No. 95-1275.
District Court of Appeal of Florida, Third District.
June 19, 1996.
Rehearing Denied December 13, 1996.
Maureen M. Malvern, John W. Costigan and Nona R. Schaffner, Tallahassee, for appellant.
Mattson & Tobin, James S. Mattson and Andrew M. Tobin, Key Largo, for appellee.
Before BARKDULL, NESBITT and GERSTEN, JJ.
BARKDULL, Judge.
Beginning in 1942, plaintiff, Key West Conch Harbor's, predecessor in title, obtained several permits from the Army Corps of Engineers for dredging and improving offshore submerged lands in Garrison Bight.[1] This predecessor in title bulkheaded and filled a parcel for which it received a Chapter 8537, Laws of Florida 1921 ("Butler Act") *145 deed in 1951 (referred to as Parcel B in the trial exhibits). The Butler Act permitted upland, riparian owners to obtain title by improving commerce and applied only to land that is "bulkheaded or filled in or permanently improved." Ch. 8537, Laws of Fla. (1921). This appeal focuses on whether or not Key West Conch Harbor's predecessor in title sufficiently improved Parcel A, and should therefore have obtained title to that land as well.[2] The parties contend that the issue before this court is whether dredging alone is a permanent improvement sufficient to convey title under the Butler Act of 1921. We disagree. This case does not involve dredging only; there are moorings and a dock on Parcel A, which must also be considered.
The trial court's findings were based on both an agreed stipulation entered into by the parties and a separate finding of fact by the trial court. The parties stipulated that Key West Conch Harbor's predecessor in title had constructed a 373 foot pier on Parcel A prior to May 29, 1951, the effective date of repeal of the Butler Act.[3] Key West Conch Harbor also presented evidence that a 138 foot extension was also added to the pier prior to May 29, 1951. As the Trustees did not produce any evidence to substantiate their position that the dredging or building of the pier on Parcel A did not occur prior to the repeal of the Butler Act, the trial court held that the dredging and entire dock had been completed by May 29, 1951. The trial court concluded that Key West Conch Harbor was vested with fee simple title to these submerged lands by virtue of the improvements made by its predecessor in interest. Accordingly, the court entered judgment confirming Key West Conch Harbor's title and fee simple interest in the submerged lands lying within 500 feet of its concrete bulkhead.
A distinguishing factor in this case is that the dredged area is adjacent to the parcel of land that was filled. This is not always the case. Often, a landowner seeking to fill land must retrieve the fill from an area offshore, rather than an area adjacent to the tract of land to be filled. If this landowner were to have dredged submerged lands out in the bight, for the sole purpose of filling another parcel of land, the Butler Act would not transfer title. However, this dredging was not done for the sole purpose of filling another parcel of land. The dredging was done to the waters around an improvement, to wit: a dock. In construing the Butler Act, the definition of an "improvement" certainly includes the construction of a dock or pier. Dep't of Natural Resources v. Industrial Plastics Technology, Inc., 603 So.2d 1303 (Fla. 5th DCA 1992) (referring to "improvements" as "buildings, wharfs, piers, dry-docks and other structures affixed to tidal or submerged lands"), review denied, 617 So.2d 318 (Fla. 1993). Although the Trustees concede that the landowner is entitled to the "footprint" of the pier, it seems that the pier would be, for the most part, useless without some incidental dredging.
The Jacksonville Shipyards case followed similar facts. Jacksonville Shipyards, Inc. v. Dep't of Natural Resources, 466 So.2d 389 (Fla. 1st DCA 1985). There, the dredging was incidental to the docks and piers and long list of improvements offered by the *146 plaintiff.[4] The First District found that the landowner was entitled to the dredged land "between these piers and docks," but the court never expressly addressed the issue of whether dredging alone is sufficient to convey title to a riparian owner under the Butler Act. Jacksonville Shipyards at 390, n. 3. Although the issue was implicated by the facts, the question was not presented to the First District. It is clear that the landowners must keep the channels and the area around the dock deep enough to be able to move vessels in and out. In fact, Jacksonville Shipyards Inc. dredged these open waters between the piers and docks every six months. Although this view is not expressed in the opinion, it seems to be the underlying rationale behind it.
Accordingly, where dredging is concerned, the determination of what constitutes an "improvement" must be determined on a caseby-case basis. The surrounding land, and other improvements under the Act must be considered in addition to the dredged land. Here, the submerged land sought is located either directly beneath the dock improvement or within 50 feet of the dock and mooring areas in the direction of the channel. We hold that the title to the land that has been dredged should pass to Key West Conch Harbor. However, the title to the land is subject to a public navigational easement, as stipulated by Key West Conch Harbor during its presentation before this Court. The trial court's order confirming Key West Conch Harbor's title and fee simple interest in the submerged lands lying within 500 feet of its concrete bulkhead is affirmed, subject to a navigational easement for the benefit of the public.
Affirmed as modified.
NESBITT, J., concurs.
GERSTEN, Judge, dissenting.
I respectfully dissent. I do not agree that the Butler Act confers title of Florida coastline to a private party. The Butler Act, a repealed hoary statute, is not an integral part of Florida's jurisprudence, and its application under these circumstances yields inequitable and environmentally unsound results. By this dissent, I register my dissatisfaction with piracy of land, land that belongs to our children and successive generations of Floridians.
The purpose of the Butler Act of 1921 was to encourage commerce by promising land rights to those enterprises that industrialized Florida's coast. See ch. 8537, Laws of Fla. (1921); Duval Eng'g & Contracting Co. v. Sales, 77 So.2d 431 (Fla.1954); Jacksonville Shipyards, Inc. v. Department of Natural Resources, 466 So.2d 389 (Fla. 1st DCA 1985); see also ch. 791, Laws of Fla. (1856) (the Riparian Act of 1856, upon which the Butler Act was based). Industries could acquire title to coastal lands which they bulkheaded, filled in, or permanently improved. This made sense in 1921, at a time when Florida's coastline sat relatively pristine and untouched,[5] and the definition of "improvement" focused on economy and expansion.
However, we neither define nor value "improvements" quite the same way today. Admittedly, while coastal commerce is still valuable to society, encouraging businesses to develop coastal land (as did the Act) is not the only commercial route to prosperity. The sheer scenic beauty, and feelings and emotions that beauty evokes, are of value beyond mundane commerce. They are treasures to be preserved for the future. But giving away land to a business that did not itself "improve" the land solely because its predecessor complied with a now-repealed statute proves too costly. This is particularly true when we receive nothing in return.
Since the repeal of the Butler Act in 1951, see § 253.10, Fla. Stat. (1951), we have begun to understand our impact on the earth and ocean. With our fuller understanding of environmental science, we realize that engaging in bulkheading, filling, or permanent "improvements" can have a permanent adverse *147 effect on our delicate aquatic ecosystem. See ch. 8537, Laws of Fla. (1921). The Butler Act would never be enacted today.
When it comes to "improvements," we are just beginning to understand that an individual's actions impact us all.[6] We now recognize that bulkheading, filling, or permanent "improvements" are rarely true improvements, at least not to the environment. But by blinding our environmental eye and "improving" land for the sole sake of commerce, we throw stones, one by one, into a pond, sending ripples through our delicate environment, often with effects we have yet to fully realize.
The judiciary's continued honoring of a repealed promise empowers many successors-in-title, no matter how far removed, to claim public terrain for doing essentially nothing. When we repealed the Butler Act, we made strides towards protecting our environment. Now, by vesting private businesses with title to the public's valuable land, we reward and entrench their environmentally unsound practices.
As the majority admits, Jacksonville Shipyards, 466 So.2d at 389, hardly controls the outcome of this case. The focus of Jacksonville Shipyards was whether filling in submerged land conveyed title under the Butler Act. Whether dredging was sufficient to grant title, which is the focus of this case, was not at issue. In fact, the Butler Act did not even list "dredging" as one of the ways title may vest in a private entity. Rather, the Butler Act conferred title only to entities that "bulkheaded or filled in or permanently improved" submerged land, see ch. 8537. Certainly dredging, under anyone's standards, cannot be deemed an "improvement."
What the majority opinion overlooks is the general principle underlying our judicial system: Courts cannot perpetuate a law that the legislature has repealed. See Ex parte McCardle, 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1868); State v. Tennyson, 212 Minn. 158, 2 N.W.2d 833 (1942). When a statute is repealed, it is as if the repealed statute never existed. See Ex Parte McCardle, 7 Wall. (74 U.S.) at 506, 19 L.Ed. 264; Yaffee v. Internat'l Co., 80 So.2d 910 (Fla.1955); Florida Birth-Related Neurological Injury Compensation Ass'n v. DeMarko, 640 So.2d 181 (Fla. 1st DCA 1994). To put it in terms fitting to this case, "[w]hen the root is cut, the branches fall." Smallwood v. Gallardo, 275 U.S. 56, 48 S.Ct. 23, 72 L.Ed. 152 (1927).
Commercial developers have no right at common law to claim title to coastal property; their right to claim title depends solely on the Butler Act. And the repeal of the Butler Act destroyed any such rights, with the narrow exception of those vested by being reduced to final judgment. See Beckman v. Thompson, 4 Cal.App.4th 481, 6 Cal. Rptr.2d 60 (1992). Because Key West Conch Harbor's predecessor-in-title failed to seek a judicial determination of its rights under the Butler Act before its repeal, Key West Conch Harbor cannot now be judicially vested with title. See Williams v. Guthrie, 102 Fla. 1047, 137 So. 682 (1931) (on rehearing).
Further, the last expression of legislative intent must control this Court's actions. McKendry v. State, 641 So.2d 45 (Fla.1994); Sharer v. Hotel Corp. of America, 144 So.2d 813 (Fla.1962); see Vildibill v. Johnson, 492 So.2d 1047 (Fla.1986); State v. Webb, 398 So.2d 820 (Fla.1981). Here, by repealing the Butler Act, the legislature clearly intended to cease vesting commercial developers with coastal land. When the judiciary chooses to ignore this legislative intent, it exceeds its authority. It also needlessly allows the destruction of our coastal treasures by virtually any commercial developer who asserts its claim forty years too late.[7] *148 This Great Land Giveaway threatens our coasts. In turn, it threatens us. Most importantly, it threatens successive generations of Floridians. Ironically, what was once intended to bolster our livelihood and bring prosperity to our shores, now robs us of our treasures. Courts, like individuals, need more often to choose the road less traveled. In this instance, we should choose the path which will protect one of the greatest treasures we can give our children: a natural environment as beautiful and healthy as that enjoyed in our youth. Because we are all in this together, I would reverse.
NOTES
[1] A bight is a wide bay formed by a bend or curve in the shoreline. The American Heritage Dictionary 178 (2d ed. 1985).
[2] Parcel A measures approximately 500 feet by 221 feet, and contains 100,294 square feet, more or less, and is contiguous to and seaward of Parcel B.
[3] The Butler Act of 1921 was repealed by implication in 1951, when the Legislature vested title to lands under tidal waters in the Trustees of the Internal Improvement Fund. Ch. 26-776, Laws of Fla. (1951); § 253.10 Fla. Stat. (1951). The Butler Act was later expressly repealed by the "Bulkhead Act" of 1957, which vested title to all submerged lands in the trustees of the internal improvement fund, provided for the disposition thereof, provided for the establishment of bulkhead lines, and prohibited certain actions on the part of the upland owners. Ch. 57-362, s. 9, Laws of Fla. (1957). Between 1951 and 1957, some submerged lands were still covered by the Butler Act, but that is irrelevant for the purposes of this case. However, it must be noted that the Bulkhead Act, Ch. 57-362, s. 9, Laws of Fla. (1957), provides that the "title to all lands heretofore filled or developed is herewith confirmed in the upland owners and the trustees shall on request issue a disclaimer to each such owner." This is still the law today, as codified in § 253.129, Fla. Stat. (1995).
[4] The structural additions included piers, docks, wharves, dry docks, railroad trestles and dredging. Jacksonville Shipyards at 390.
[5] Florida's population has grown from 120,000 in 1856, to 970,000 in 1920, to an estimated 14 million today. Bureau of Econ. & Bus. Research, University of Fla., Florida Statistical Abstract 4, 26 (28th ed. 1994).
[6] Chief Seattle is credited with these words:

And what is there to life if a man cannot hear the lovely cry of a whippoorwill or the arguments of the frogs around a pond at night?... For all things must share the same breaththe beasts, the trees, the man.... All things are connected. Whatever befalls the earth befalls the sons of the earth.
See Paul S. Wilson, What Chief Seattle Said, 22 Envtl.L. 1451 (1992).
[7] As President Havel noted, "it's important that man have a home on this earth, not just a dwelling place; it's important that his world have an order, a culture, a style; it's important that the landscape be respected and cultivated with sensitivity, even at the expense of growth in productivity." Vaclav Havel, Disturbing the Peace 15 (Paul Wilson trans., Vintage Books 1991).