714 So.2d 1060 (1998)
CITY OF WEST PALM BEACH, Appellant,
v.
BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT TRUST FUND, State of Florida Department of Environmental Protection, and Leisure Resorts, Inc., a Delaware corporation, Appellees.
No. 95-3813.
District Court of Appeal of Florida, Fourth District.
June 10, 1998.
Rehearing, Rehearing and Certification of Question Denied August 4, 1998.
William P. Doney of Vance & Doney, P.A., West Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, F. Perry Odom, General Counsel, and Maureen M. Malvern, Assistant General Counsel, Florida Department of Environmental Protection, Tallahassee, for Appellees Board of Trustees of the Internal Improvement Trust Fund and State of Florida Department of Environmental Protection.
Rehearing, Rehearing En Banc and Certification of Question Denied August 4, 1998.

ON APPELLEES' MOTION FOR REHEARING
GROSS, Judge.
We grant appellees' motion for rehearing, withdraw our previous opinion, and issue the following opinion in its place.
*1061 The City of West Palm Beach appeals from a final summary judgment entered in favor of the Board of Trustees of the Internal Improvement Trust Fund of the State of Florida. The judgment confirmed fee simple ownership of certain submerged lands in the Board, except that it required the Board to issue a disclaimer to the City for the land immediately beneath four piers. We affirm.
The City filed a quiet title suit in which it claimed ownership of approximately 26 acres of submerged lands in an area commonly known as the Palm Harbor Marina in downtown West Palm Beach. More than ninety-five percent of the lands claimed by the City are covered by open waters. The facts of the case are not in dispute.
In 1946, the City obtained a permit to construct a municipal marina on the subject lands, which were submerged under the intracoastal waterway. The marina was built between 1947 and 1949. Construction included the erection of four piers with precast reinforced concrete, ranging from 380 to 450 feet in length and extending eastward from the bulkhead into the intracoastal waterway. The city dredged a boat basin in the areas between and surrounding the piers and a channel from the boat basin to the channel of the intracoastal waterway.
The City based its claim to ownership on the Butler Act,[1] Chapter 8537, Laws of Florida (1921), formerly section 271.01, Florida Statutes, and the Riparian Rights Act of 1856, Chapter 791, Laws of Florida (1856). The City argued that title had vested under the Butler Act when it permanently improved the submerged lands by building the marina and dredging the area surrounding the piers. The Butler Act was expressly repealed by the Bulkhead Act of 1957, which vested title to all submerged lands in the trustees of the Internal Improvement Fund. Ch. 57-362, Laws of Fla. However, section 9 of the 1957 statute provided that "title to all lands heretofore filled or developed is herewith confirmed in the upland owners and the trustees shall on request issue a disclaimer to each such owner." Section 9 is codified today in section 253.129, Florida Statutes (1997). Thus, the City's claim predates the repeal of the Butler Act. The City's case turns on the interpretation of that 1921 statute.
In its final judgment, the trial court concluded that the City was entitled to a disclaimer only as to the land immediately beneath the four piers, which it referred to as the "footprint" of the piers. The court concluded that dredging of the submerged land around the piers did not constitute a "permanent improvement" under the Butler Act, so title to those lands had not vested in the City.
We begin our analysis by noting what this case is not about. This case does not concern the City's entitlement to a disclaimer as to the land beneath the footprint of the piers. The Board conceded that point in the trial court. Nor does this case involve the City's ability to continue to dredge in the area surrounding the piers, so that the marina will continue to be viable. Rather, as the trial court recognized, the issue in this case is whether the City has fee simple title to the submerged lands, a form of ownership which could give rise to expansion of the existing marina or even to the filling in of the submerged lands for more intensive development.[2]
When Florida was admitted to the Union in 1845, it became the owner of all *1062 lands beneath navigable waters. See Coastal Petroleum Co. v. American Cyanamid Co., 492 So.2d 339, 342 (Fla.1986); Trustees of Internal Improvement Fund v. Claughton, 86 So.2d 775, 786 (Fla.1956). The state government holds the lands beneath navigable waters "in trust for the whole people within" the state. State ex rel. Ellis v. Gerbing, 56 Fla. 603, 47 So. 353, 355 (1908); see Coastal Petroleum, 492 So.2d at 342; Hayes v. Bowman, 91 So.2d 795, 798-99 (Fla.1957). In a case involving the Riparian Rights Act of 1856, the supreme court described the nature of this public trust, and the ability of the legislature to alienate land so held:
[A]t the time of the passage of our riparian act the navigable waters of the state and the soil beneath them, including the shore or space between high and low water marks, were the property of the state, or of the people of the state in their united or sovereign capacity, and were held, not for the purposes of sale or conversion into other values, or reduction into several or individual ownership, but for the use and enjoyment of the same by all the people of the state for at least the purposes of navigation and fishing and other implied purposes; and the lawmaking branch of the government of the state, considered as the fiduciary or representative of the people, were, when dealing with such lands and waters, limited in their powers by the real nature and purposes of the tenure of the same, and must be held to have acted with a due regard for the preservation of such lands and waters to the uses for which they were held.
State v. Black River Phosphate Co., 32 Fla. 82, 13 So. 640, 648 (1893).
The Butler Act re-enacted the Riparian Rights Act of 1856 "so as to make it apply to riparian proprietors owning lands extending to high-water mark, and adding certain additional provisions." Pembroke v. Peninsular Terminal Co., 108 Fla. 46, 146 So. 249, 256 (1933).
The purpose of the Butler Act was "to stimulate and encourage the improvement of submerged lands and to improve the foreshore in the interest of commerce and navigation." Duval Eng'g and Contracting Co. v. Sales, 77 So.2d 431, 433 (Fla.1954); see State ex rel. Buford v. City of Tampa, 88 Fla. 196, 102 So. 336, 340-41 (1924). As is noted above, the legislature expressly repealed the Butler Act in 1957.[3] Ch. 57-362, Laws of Fla. After 36 years of development of Florida's coastline, the public policy that had justified the Butler Act had evaporated. Discussing the repeal of the Act, the supreme court has written:
In 1957, this public policy [seeking to stimulate development] was changed because of concern for the rights of the public in submerged sovereignty lands.
Board of Trustees of the Internal Improvement Trust Fund v. Sand Key Assocs., Ltd., 512 So.2d 934, 938 (Fla.1987).
The Butler Act permitted upland riparian owners to obtain title to submerged lands abutting land owned by them, provided that the submerged land was "actually bulk-headed[4] or filled in or permanently improved continuously from high water mark in the direction of the channel." Ch. 8537, § 1, at 333, Laws of Florida (1921). In pertinent part, the Butler Act provided:
Section 1. Whereas, It is for the benefit of the State of Florida that water front property be improved and developed: and
Whereas, the State being the proprietor of all submerged lands and water privileges within its boundaries, which prevents the riparian owners from improving their water lots: therefore

*1063 The State of Florida, for the consideration above mentioned, subject to any inalienable trust under which the State holds said lands, divests itself of all right, title and interest to all lands covered by water lying in front of any tract of land owned by ... any person, natural or artificial, or by any municipality, county or governmental corporation under the laws of Florida, lying upon any navigable stream or bay of the sea or harbor, as far as to the edge of the channel, and hereby vests the full title to the same, subject to said trust in and to the riparian proprietors, giving them the full right and privilege to build wharves into streams or waters of the bay or harbor as far as may be necessary to affect the purposes described, and to fill up from the shore, bank or beach as far as may be desired, not obstructing the channel, but leaving full space for the requirements of commerce, and upon lands so filled in to erect warehouses, dwellings or other buildings and also the right to prevent encroachments of any other person upon all such submerged land ...
Provided that the grant herein made shall apply to and affect only those submerged lands which have been, or may be hereafter, actually bulk-headed or filled in or permanently improved continuously from high water mark in the direction of the channel, or as near in the direction of the channel as practicable to equitably distribute the submerged lands, and shall in no wise affect such submerged lands until actually filled in or permanently improved....
Sec. 8. Nothing in this Act contained shall be construed to prohibit any person from boating, bathing or fishing in water covering the submerged lands of this State or from exercising any of the privileges heretofore allowed by law as to such submerged land and water covering the same, until such submerged lands shall be filled in or improved by the riparian owner as herein authorized.
Ch. 8537, §§ 1, 8, at 332-34, Laws of Fla. (1921) (emphasis supplied).
The divestiture of title contemplated by the Butler Act is subject to the public trust under which the state government holds submerged lands for the benefit of all the citizens of the state. See Pembroke, 146 So. at 256-57. The third paragraph of section 1, states that the divestment is "subject to any inalienable trust under which the State holds said lands." Ch. 8357 § 1, at 332, Laws of Fla. (1921). Later in the same paragraph, the statute reiterates that the vesting of "full title" is "subject to said trust." Id. at 333.
Since the Butler Act is in derogation of this public trust, it must be "strictly construed in favor of the sovereign." Claughton, 86 So.2d at 786. Black River Phosphate stated
the rule applicable to all grants by the government, which is that they are to be strictly construed, or be taken most beneficially in favor of the state or public, and against the grantee. [Citations omitted]. It will not be presumed that anything was intended to pass that is not denoted by clear and special words.

13 So. at 648 (emphasis supplied); see also Sullivan v. Richardson, 33 Fla. 1, 118, 121, 14 So. 692, 709, 710 (1894).
Application of the rule of strict construction to the Butler Act leads to the conclusion that to obtain title to submerged lands, a riparian owner needed to either build wharves, fill in submerged land and erect permanent buildings upon the fill, or, at the very least, erect permanent structures on the underwater property. The notion that the dredging of submerged lands in conjunction with the building of a permanent improvement, could expand the Act's reach to convey title to land beyond the improvement itself, is antithetical to the strict construction of the statute in favor of the state.
The third paragraph of section 1 of the Butler Act gave a riparian landowner
the full right and privilege to build wharves into streams or waters of the bay or harbor ... and to fill up from the shore, bank or beach as far as may be desired, not obstructing the channel ... and upon lands so filled in to erect warehouses, dwellings or other buildings.
Ch. 8537, § 1, at 333, Laws of Fla. (1921). This paragraph describes the scope of the *1064 grant that is accorded to landowners who develop waterfront property.
The fourth paragraph of section one was not contained in the 1856 Act. It clarifies that the state's divestiture of title is contingent on the actual development of property at issue. See Duval Eng'g and Contracting Co. v. Sales, 77 So.2d 431, 433 (Fla.1954). This paragraph of section one provides
that the grant herein made shall apply to and affect only those submerged lands which have been or may be hereafter, actually bulk-headed or filled in or permanently improved continuously from high water mark in the direction of the channel... and shall in no wise affect such submerged lands until actually filled in or permanently improved.
Ch. 8537, § 1, at 333, Laws of Fla. (1921) (emphasis supplied). The words "only" and "actually" are words of limitation, inconsistent with the idea that dredging in conjunction with filling in or permanently improving submerged land can transfer title to the dredged land. These words limit the scope of divestiture of land to that which is actually bulkheaded, filled in or permanently improved, and no further.
The dispute in this case does not concern land that was bulkheaded or filled in, terms specifically set forth in the statute. The phrase "permanently improved" relates back to the specific permanent improvements ___"wharves ... warehouses, dwellings or other buildings"___ mentioned in the preceding paragraph. Where a statute first uses "terms each evidently confined and limited to a particular class of a known species of things," and later uses a broader term, the more general word is construed as applying to the "same kind of species with those comprehended by the preceding limited and confined terms." Dunham v. State, 140 Fla. 754, 192 So. 324, 326 (1939) (quoting Ex parte Amos, 93 Fla. 5, 112 So. 289, 293 (1927)). As the supreme court has explained this principle of statutory construction,
general and specific words which are capable of an analogous meaning being associated together take color from each other, so that the general words are restricted to a sense analogous to the less general.
Id.
If the Butler Act is to vest title in the City, it must be because dredging is included within the statutory phrase "permanently improved." However, applying the rule of strict construction and giving weight to the words of limitation in the statute, the phrase "permanently improved" denotes, at the very least, significant structures which are the functional equivalent of the "wharves ... warehouses, dwellings or other buildings" referred to in the first paragraph of section one. The Butler Act granted owners exclusive rights only over those parcels of submerged land underneath the foundations for wharves or "permanent" structures or which were filled in and used for the construction of "warehouses, dwellings, or other buildings." Only such land is "actually ... permanently improved" within the meaning of the statute.
This reading of the statute harmonizes with section eight of the Act, which provides that nothing in the statute shall be construed to prohibit the public from boating, bathing, fishing or exercising "privileges" previously allowed as to the submerged land, "until such submerged lands shall be filled in or improved by the riparian owners as herein authorized." Ch. 8537, § 8, at 334, Laws of Fla. (1921). These specified activities can be performed in open water areas that have been dredged. The statute contemplates that title will pass when the public's access to the submerged land has been completely foreclosed by development.
Land under open water can never be subject to divestiture under the Act, even where it has been dredged incident to a permanent improvement. Black River Phosphate teaches that title to lands subject to the public trust cannot pass unless "denoted by clear and special words." 13 So. at 648. The Butler Act does not mention dredging as it does bulkheading or filling. If the legislature had intended to grant title to land that was only dredged, it would have so stated, as it did in the case of land that was filled in or bulkheaded.
*1065 The supreme court has applied the Butler Act to significant permanent improvements. For example, Holland v. Fort Pierce Financing & Constr. Co., 157 Fla. 649, 27 So.2d 76, 78, 82 (1946), involved a landowner who constructed a bulkhead about 750 feet out in a river, filled in behind the bulkhead, and erected piers, docks, packing houses, precooling plants and other improvements. City of Tampa concerned the owners of two islands who desired to erect bulkheads and fill in submerged land to develop a "highclass residential development." 102 So. at 339, 341. Trumbull v. McIntosh, 103 Fla. 708, 138 So. 34 (1931), dealt with a corporation that filled "`up from the shore' some distance into the water ... [and] divided the land, including that filled in from the shore, into lots and blocks."
Williams v. Guthrie, 102 Fla. 1047, 137 So. 682 (1931), demonstrates that our supreme court has also understood that a "permanent improvement" under the Act contemplates more intensive development of submerged lands than mere dredging. On rehearing, the court in Williams addressed the question of whether the Butler Act operated to vest title in the owner of a dock or pier, with attached buildings, built upon the submerged bottom of Sarasota Bay. The supreme court observed that the dock "was not essentially such a permanent improvement of the character required by the Riparian Rights Act as to vest title in the riparian proprietor." Id. at 686. The court went on to state that
[t]o vest title to submerged lands in the riparian proprietor under the act, the submerged lands to which title is asserted must have been actually bulkheaded or filled in, or permanently improved continuously from high-water mark in the direction of the channel, or as near in the direction of the channel as practicable to equitably distribute the submerged lands.
Id.
No supreme court case holds that dredging of submerged land in conjunction with the erection of piers constitutes a "permanent improvement" under the Butler Act. Jacksonville Shipyards, Inc. v. Dep't of Natural Resources, 466 So.2d 389 (Fla. 1st DCA 1985), held that a landowner had permanently improved 17.30 acres of submerged lands within the meaning of the Butler Act. The focus of the government's case was that submerged land needed to have been filled in to trigger the Butler Act's transfer of title. Jacksonville Shipyards demonstrates the type of permanent improvement contemplated by the Act in the absence of fill. The case involved significant structures and development, including a marine railway dry dock, two docks and a pier with a 30 ton crane, a 4,500 ton floating dry dock, a 12,000 ton floating dry dock, 446.2 feet of bulkheading, and three separate piers with warehouses. The first district held that the Butler Act vested the landowner with title to the 17.30 acres, apparently including the dredged underwater land between the piers and docks. The court never honed in on the issue of whether dredged land in the spaces between intense development was subject to the Act.
In Jacksonville Shipyards, the first district was not presented with the issue raised here___ that the Butler Act should apply to the footprint of the development and to nothing more. Jacksonville Shipyards illustrates the anomaly of characterizing submerged, dredged land as being a permanent improvement. The opinion indicates that the open waters between the piers and docks were dredged about every six months. Id. at 390, n. 3. After dredging, the shifting waters and currents made the condition of submerged lands anything but permanent.
The City relies heavily on State, Bd. of Trustees Internal Improvement Trust Fund v. Key West Conch Harbor, Inc., 683 So.2d 144 (Fla. 3d DCA 1996), review denied, 695 So.2d 698 (Fla.1997). That case expressly holds that under the Butler Act, the dredging of land adjacent to an "improvement" is sufficient to vest title in the dredged land. The problem with the third district's analysis in Key West is that it is too myopic, looking no further back in time for authority than Jacksonville Shipyards.
Key West and Jacksonville Shipyards fail to acknowledge the rule of strict construction of Black River Phosphate. Key West construes the Butler Act under a loose "reasonableness" standard inappropriate to the issue of whether the state has been divested of *1066 title to submerged lands. Further, the opinion does not address the language of the Butler Act that requires submerged land to be "permanently improved" for the statute to apply. Key West indicates only that "where dredging is concerned, the determination of what constitutes an `improvement' must be determined on a case-by-case basis." Key West, 683 So.2d at 146. Key West rejected the argument that the landowner's title was limited to the "footprint" of the pier. It reasoned that the pier "would be ... useless without some incidental dredging." Id. at 145. However, incidental dredging to keep the marina functional would not be precluded because the State, and not the landowner, holds title to the submerged land.[5]
Key West thus arrives at its result contrary to two factors crucial to the case___ that the Butler Act is strictly construed in favor of the state and that submerged land must be actually filled in, bulkheaded, or permanently improved to trigger application of the statute. The holding of Key West___ that "where dredging is concerned, the determination of what constitutes an `improvement' must be determined on a case-by-case basis"___ is too amorphous a standard by which to decide the issue of title to irreplaceable submerged land within the public trust.
The trial court correctly applied the Butler Act to the facts of this case. The City was only entitled to a disclaimer as to the land immediately beneath the four piers, referred to by the trial court as the "footprint" of the piers. We affirm the final judgment of the trial court and certify conflict with Key West pursuant to Florida Rule of Appellate Procedure 9.030(a)(2)(A)(vi).
PARIENTE, BARBARA J., Associate Judge, concurs.
POLEN, J., dissents with opinion.
POLEN, Judge, dissenting.
I respectfully dissent. While I agree the majority opinion, as it now appears, is in conflict with State, Bd. of Trustees of Internal Improvement Trust Fund v. Key West Conch Harbor, Inc., 683 So.2d 144 (Fla. 3d DCA 1996), I would adhere to our original panel decision of August 27, 1997, reversing in favor of appellant. See City of West Palm Beach v. Board of Trustees, ___ So.2d ___, 22 Fla. L. Weekly D2028 (Fla. 4th DCA Aug.27, 1997).
NOTES
[1] The statute "deriv[ed] its name from its sponsor, Senator J. Turner Butler of Duval County." Hayes v. Bowman, 91 So.2d 795, 800 (Fla.1957).
[2] The following exchange occurred between the trial court and the City's attorney:

The Court: Does that mean you can come along and do the filling in later after you do the dredging originally?
Mr. Doney: This case isn't about filling. I mean, I understand; maybe your thinking is that is the next step. Now it is true
The Court: Well, if I rule the way you want me to rule, that could be the next step, couldn't it? I understand permits might be a real problem.
Mr. Doney: Yes. In theory it could be.
The Court: In theory that's what you could do.
Mr. Doney: I don't know if anyone has intended to do that. Who knows?
The Court: You have that kind of ownership of the land?
Mr. Doney: Correct. Correct.
[3] The fifth district has observed that the Butler Act was repealed by implication in 1951, when the legislature vested title to lands under tidal waters in the trustees of the Internal Improvement Fund. See Chiles v. Floridian Sports Club, Inc., 633 So.2d 50, 52 (Fla. 5th DCA 1994); Ch. 26 776, Laws of Fla. (1951). After the passage of the 1951 statute, the Butler Act "remained viable as to all non-tidal submerged lands in the state and all tidal lands in Dade and Palm Beach counties." Chiles, 633 So.2d at 52. The Bulkhead Act of 1957, Chapter 57-362, Laws of Florida, expressly repealed the entire Butler Act, both as to tidal and non-tidal waters. See id.
[4] A "bulkhead" is a "retaining structure of timber, steel, or reinforced concrete, used for shore protection and in harbor works." The Random House Dictionary of the English Language, Unabridged Ed. 195 (1967).
[5] Appellees have conceded that the City has "the right to use their marina" and "to use the waters around their docks." The record reflects that when the Butler Act was in effect the state freely granted upland owners permission to dredge on the condition that the public retained its right to the open waters.