746 So.2d 1085 (1999)
CITY OF WEST PALM BEACH, Petitioner,
v.
BOARD OF TRUSTEES OF the INTERNAL IMPROVEMENT TRUST FUND, State of Florida Department of Environmental Protection, and Leisure Resorts, Inc., a Delaware corporation, Respondents.
Nos. 93,821.
Supreme Court of Florida.
September 9, 1999.
Patrick N. Brown, City Attorney, and Claudia M. McKenna, Assistant City Attorney, West Palm Beach, Florida and William P. Doney of Vance & Doney, West Palm Beach, Florida, for petitioner.
F. Perry Odom, General Counsel, John W. Costigan, Deputy General Counsel and Maureen M. Malvern, Senior Assistant General Counsel, Tallahassee, Florida, for respondents.
Thomas M. Shuler, Apalachicola, Florida, for Olan B. Ward, Sr., Martha Pearl Ward, Anthony Taranto, Antoinette Taranto, J.V. Gander Distributors, Inc., A Florida Corporation, J.V. Gander, Jr. and Three Rivers Properties, Inc., a Florida Corporation, amicus curiae.
*1086 Jonathan A. Glogau, Assistant Attorney General, Tallahassee, Florida, for Robert A. Butterworth, Attorney General, amicus curiae.
WELLS, J.
We have for review City of West Palm Beach v. Board of Trustees of the Internal Improvement Trust Fund, 714 So.2d 1060 (Fla. 4th DCA 1998) (hereinafter West Palm Beach), which certified conflict with the opinion in State Board of Trustees of the Internal Improvement Trust Fund v. Key West Conch Harbor, Inc., 683 So.2d 144 (Fla. 3d DCA 1996) (hereinafter Key West). We have jurisdiction. Art. V, § 3(b)(4), Fla. Const.

FACTS AND PROCEDURAL HISTORY
In 1946, the City of West Palm Beach (hereinafter City) obtained a permit to construct a municipal marina on state sovereignty lands submerged under the intracoastal waterway. The marina was built between 1947 and 1949, pursuant to the Butler Act[1] and its predecessor Riparian Rights Act of 1856,[2] which divested the State of Florida of fee simple title to submerged lands upon which upland owners constructed certain improvements in the interest of encouraging commerce by developing waterfront property. The City's project, known as Palm Harbor Marina, included the erection of four piers with precast reinforced concrete, ranging from 380 to 450 feet in length and extending eastward from the bulkhead into the intracoastal waterway. The City dredged a boat basin in the areas between and surrounding the piers and a channel from the boat basin to the channel of the intracoastal waterway.
In 1957, the legislature repealed the Butler Act as to Palm Beach County but confirmed title for upland riparian owners in "all lands heretofore filled or developed" before the Act's repeal.[3] The record reflects that in 1969 the City applied for and received from the Board of Trustees of the Internal Improvement Trust Fund (hereinafter Board) a disclaimer, pursuant to section 253.129, Florida Statutes, as to a 5.2-acre parcel of submerged land that had been filled to provide land upon which to build the marina. In the 1970s, the Board began requiring submerged land leases to compensate the State of Florida for "public and private activities on submerged lands which generate revenues or exclude traditional public uses." Fla.Admin.Code R. 18-21.001(5). Preexisting improvements to submerged lands could be registered as "grandfathered structures" until 1998 without payment of lease fees. Fla.Admin.Code R. 18-21.00405. The record reflects that in 1984 the City applied to the Board for grandfathered status for certain submerged lands relevant to the Palm Harbor Marina. The City stated in its application for grandfather status:
The activity which is the subject of this application is private boat slip rentals.... The slips are not available to the general public for docking boats on a transient basis, but are restricted to those boat owners who pay a fee for their use. The dock area is open to the general public, but the docks are not available for swimming purposes.
"Application for Registration of a Grandfathered Structure," Record on Appeal at 202.
In 1985, the Board granted grandfather status for the land under the piers. In 1994, the City filed suit to quiet title to twenty-six acres of submerged lands in the vicinity of the Palm Harbor Marina including land under the docks previously grandfathered and the dredged bottomlands surrounding *1087 them. The Board filed a quiet title counterclaim. The City's lessee, Leisure Resorts, Inc., intervened in the City's case. The Board conceded that the City was entitled to land immediately beneath its four piers, referred to as the "footprints" of the piers. Both the Board and the City moved for summary judgment.
The trial court entered a final summary judgment in favor of the Board on November 1, 1995. The trial court concluded that the City was entitled to a disclaimer only as to the land immediately beneath the four piers (the footprints), which the Board had conceded. The court concluded that dredging of the submerged lands between and surrounding the piers and under a channel from the boat basin to the channel of the intracoastal waterway did not constitute a "permanent improvement" under the Butler Act, and thus the title to these lands had not vested in the City. The judgment confirmed fee simple ownership of these submerged dredged lands in the Board and required the Board to issue a disclaimer to the City for the "footprint" submerged land immediately beneath the four piers.
The City appealed, and the Fourth District Court of Appeal reversed and adopted the Third District's view in Key West that the issue of whether dredging constitutes an improvement should involve a case-by-case analysis that includes a consideration of surrounding lands and other improvements made. City of West Palm Beach v. Board of Trustees of the Internal Improvement Trust Fund, 22 Fla.L. Weekly D2028 (Fla. 4th DCA Aug. 27, 1997). The Attorney General and counsel for the Department of Environmental Protection, acting as attorneys for the Board, filed a motion for rehearing on September 10, 1997. The Fourth District granted the motion, withdrew its 1997 opinion, and substituted a revised opinion, West Palm Beach, which is the case presently under review in this Court. The revised opinion, which is in accord with Judge Gersten's dissent in Key West, affirmed the trial court's final summary judgment in favor of the Board. West Palm Beach, 714 So.2d at 1066.
In West Palm Beach, the Fourth District stated that the issue was whether the City had fee simple title to the submerged lands, a form of ownership that "could give rise to expansion of the existing marina or even to the filling of the submerged lands for more intensive development." Id. at 1061. The district court discussed the evolution of riparian rights law, including the Butler Act, and found that the district courts in Key West and Jacksonville Shipyards, Inc. v. Department of Natural Resources, 466 So.2d 389 (Fla. 1st DCA 1985), had failed to acknowledge the rule of strict construction which this Court provided for riparian rights statutes in State v. Black River Phosphate Co., 32 Fla. 82, 13 So. 640 (1893). 714 So.2d at 1065-66. The Fourth District noted that the Third District had employed reasoning in Key West that was contrary to two factors crucial to West Palm Beach: (1) that the Butler Act is strictly construed in favor of the state; and (2) that submerged land must be actually filled in, bulkheaded, or permanently improved to trigger application of the statute. Id. at 1066. The Fourth District concluded that dredging is not a permanent improvement as intended by the legislature in the Butler Act and held that the City was entitled only to fee simple ownership of the "footprint" land immediately beneath the four piers of Palm Harbor Marina. Id. The Fourth District certified to this Court conflict with Key West. Id.

LAW AND ANALYSIS
As the Fourth District stated below, the broad issue in this case is whether the City has acquired fee simple title to submerged sovereignty state lands by virtue of the City's dredging of such underwater lands, thereby entitling the City to exercise property rights pursuant to such ownership. Resolution of that issue depends upon a statutory construction as to whether the City's dredging of submerged *1088 bottomlands in the vicinity of Palm Harbor Marina's piers has "permanently improved" such lands according to the plain language of the now-repealed 1921 Butler Act and thus has caused title to these dredged submerged lands to vest in the City. The Butler Act provided in relevant part:
Section 1. Whereas, It is for the benefit of the State of Florida that water front property be improved and developed; and
Whereas, the State being the proprietor of all submerged lands and water privileges within its boundaries, which prevents the riparian owners from improving their water lots; therefore
The State of Florida, for the consideration above mentioned, subject to any inalienable trust under which the State holds said lands, divests itself of all right, title and interest to all lands covered by water lying in front of any tract of land owned by the United States or by any person, natural or artificial, or by any municipality, county or governmental corporation under the laws of Florida, lying upon any navigable stream or bay of the sea or harbor, as far as to the edge of the channel, and hereby vests the full title to the same, subject to said trust in and to the riparian proprietors, giving them the full right and privilege to build wharves into streams or waters of the bay or harbor as far as may be necessary to affect the purposes described, and to fill up from the shore, bank or beach as far as may be desired, not obstructing the channel, but leaving full space for the requirements of commerce, and upon lands so filled in to erect warehouses, dwellings or other buildings and also the right to prevent encroachments of any other person upon all such submerged land in the direction of their lines continued to the channel by bill in chancery or at law, and to have and maintain action of trespass in any court of competent jurisdiction in the State, for any interference with such property, also confirming to the riparian proprietors all improvements which may have heretofore been made upon submerged lands.
Provided, that the grant herein made shall apply to and affect only those submerged lands which have been, or may be hereafter, actually bulk-headed or filled in or permanently improved continuously from high water mark in the direction of the channel, or as near in the direction of the channel as practicable to equitably distribute the submerged lands, and shall in no wise affect such submerged lands until actually filled in or permanently improved.
Ch. 8537, Laws of Fla. (1921) (emphasis added).
Petitioner (City) points to the statutory phrase "actually bulk-headed or filled in or permanently improved" and contends in this Court that the use of the word "or" indicates that the legislature meant that "permanently improved" was a separate category with a status equal to the terms "bulk-headed" and "filled in." The City maintains that this category includes various types of improvements including the City's dredging of submerged lands. We disagree. In its well-reasoned analysis, the Fourth District below has construed the Butler Act and has concluded that the Legislature did not intend for dredging of submerged lands to be among the types of "permanent improvements" subject to divestiture of title in state submerged lands.
The Fourth District began its account of the evolution of riparian rights in Florida by describing the nature of the Legislature's authority to enact the 1856 Riparian Act considering the public trust under which the government held the navigable waters that Florida acquired when it became a state in 1845:
[A]t the time of the passage of [the Riparian Rights Act of 1856] the navigable waters of the state and the soil beneath them, including the shore or space between high and low water marks, were the property of the state, or of the *1089 people of the state in their united or sovereign capacity, and were held, not for the purposes of sale or conversion into other values, or reduction into several or individual ownership, but for the use and enjoyment of the same by all the people of the state for at least the purposes of navigation and fishing and other implied purposes; and the lawmaking branch of the government of the state, considered as the fiduciary or representative of the people, were, when dealing with such lands and waters, limited in their powers by the real nature and purposes of the tenure of the same, and must be held to have acted with a due regard for the preservation of such lands and waters to the uses for which they were held.
West Palm Beach, 714 So.2d at 1062 (quoting Black River Phosphate, 32 Fla. at 106, 13 So. at 648).
As the Fourth District explained, the Legislature in the 1921 Butler Act reenacted the Riparian Rights Act of 1856 with the express purpose of improving and developing Florida's waterfront. Such development was to be encouraged by permitting upland riparian owners to obtain title to submerged lands abutting land owned by them with the Butler Act's added condition that the submerged land was "actually bulk-headed or filled in or permanently improved continuously from high water mark in the direction of the channel." Ch. 8537, § 1 at 333, Laws of Fla. (1921) (emphasis added). Within the Butler Act, the Legislature provided that the Act's provisions for divestiture should not "prohibit any person from boating, bathing or fishing in water covering the submerged lands of this State" absent the prior condition that such lands had been "filled in or improved by the riparian owner." Ch. 8537, § 8 at 334, Laws of Fla. (1921).
As this Court held in Black River Phosphate, any divestiture of state sovereignty land pursuant to the Butler Act must be limited by the fact that the State holds sovereign submerged lands in public trust for the benefit of all the citizens of the State. 13 So. at 646; see also Coastal Petroleum Co. v. American Cyanamid Co., 492 So.2d 339, 342 (Fla.1986); Pembroke v. Peninsular Terminal Co., 108 Fla. 46, 146 So. 249 (1933); State ex rel. Ellis v. Gerbing, 56 Fla. 603, 47 So. 353 (1908). Thus, divestiture of sovereign lands under the Butler Act is in derogation of the public trust and the Butler Act "must be strictly construed in favor of the sovereign." Trustees of Internal Improvement Fund v. Claughton, 86 So.2d 775, 786 (Fla.1956). Based on these principles, we agree with and adopt the following construction by the Fourth District of the now-repealed Butler Act as it applies in this case:
Application of the rule of strict construction to the Butler Act leads to the conclusion that to obtain title to submerged lands, a riparian owner needed to either build wharves, fill in submerged land and erect permanent buildings upon the fill, or, at the very least, erect permanent structures on the underwater property. The notion that the dredging of submerged lands in conjunction with the building of a permanent improvement, could expand the Act's reach to convey title to land beyond the improvement itself, is antithetical to the strict construction of the statute in favor of the state.
The third paragraph of section 1 of the Butler Act gave a riparian landowner
the full right and privilege to build wharves into streams or waters of the bay or harbor ... and to fill up from the shore, bank or beach as far as may be desired, not obstructing the channel ... and upon lands so filled in to erect warehouses, dwellings or other buildings.
Ch. 8537, § 1, at 333, Laws of Fla. (1921). This paragraph describes the scope of the grant that is accorded to landowners who develop waterfront property.

*1090 The fourth paragraph of section one was not contained in the 1856 Act. It clarifies that the state's divestiture of title is contingent on the actual development of property at issue. This paragraph of section one provides
that the grant herein made shall apply to and affect only those submerged lands which have been or may be hereafter, actually bulk-headed or filled in or permanently improved continuously from high water mark in the direction of the channel ... and shall in no wise affect such submerged lands until actually filled in or permanently improved.
Ch. 8537, § 1, at 333, Laws of Fla. (1921). The words "only" and "actually" are words of limitation, inconsistent with the idea that dredging in conjunction with filling in or permanently improving submerged land can transfer title to the dredged land. These words limit the scope of divestiture of land to that which is actually bulkheaded, filled in or permanently improved, and no further.
The dispute in this case does not concern land that was bulkheaded or filled in, terms specifically set forth in the statute. The phrase "permanently improved" relates back to the specific permanent improvements"wharves ... warehouses, dwellings or other buildings" mentioned in the preceding paragraph. Where a statute first uses "terms each evidently confined and limited to a particular class of a known species of things," and later uses a broader term, the more general word is construed as applying to the "same kind of species with those comprehended by the preceding limited and confined terms." Dunham v. State, 140 Fla. 754, 192 So. 324, 326 (1939) (quoting Ex parte Amos, 93 Fla. 5, 112 So. 289, 293 (1927)). As the supreme court has explained this principle of statutory construction,
general and specific words which are capable of an analogous meaning being associated together take color from each other, so that the general words are restricted to a sense analogous to the less general.
Id.
If the Butler Act is to vest title in the City, it must be because dredging is included within the statutory phrase "permanently improved." However, applying the rule of strict construction and giving weight to the words of limitation in the statute, the phrase "permanently improved" denotes, at the very least, significant structures which are the functional equivalent of the "wharves... warehouses, dwellings or other buildings" referred to in the first paragraph of section one. The Butler Act granted owners exclusive rights only over those parcels of submerged land underneath the foundations for wharves or "permanent" structures or which were filled in and used for the construction of "warehouses, dwellings, or other buildings." Only such land is "actually... permanently improved" within the meaning of the statute.
This reading of the statute harmonizes with section eight of the Act, which provides that nothing in the statute shall be construed to prohibit the public from boating, bathing, fishing or exercising "privileges" previously allowed as to the submerged land, "until such submerged lands shall be filled in or improved by the riparian owners as herein authorized." Ch. 8537, § 8, at 334, Laws of Fla. (1921). These specified activities can be performed in open water areas that have been dredged. The statute contemplates that title will pass when the public's access to the submerged land has been completely foreclosed by development.
Land under open water can never be subject to divestiture under the Act, even where it has been dredged incident to a permanent improvement. Black River Phosphate teaches that title to lands subject to the public trust cannot pass unless "denoted by clear and special *1091 words." 13 So. at 648. The Butler Act does not mention dredging as it does bulkheading or filling. If the legislature had intended to grant title to land that was only dredged, it would have so stated, as it did in the case of land that was filled in or bulkheaded.
714 So.2d at 1063-64 (citation omitted).
In support of its position that dredging constitutes a permanent improvement in this case, the City cites the First District's 1985 decision in Jacksonville Shipyards and Third District's 1996 decision in Key West. In Jacksonville Shipyards, the First District held that "filling in" submerged land prior to repeal of the Butler Act was not a requirement for acquiring a disclaimer confirming title to such land. 466 So.2d at 393. Under the facts of the case, the First District held that, contrary to the then-existing Department of Natural Resources rule, both bulkheading and permanent improvements were acts sufficient to vest title in the upland owner. Id. at 392. The First District did not directly address the issue as to whether dredging of submerged lands constituted a permanent improvement. The only mention of dredging in Jacksonville Shipyards was in a footnote in which the district court noted that the record indicated among a list of various "improvements" that Jacksonville Shipyards, Inc. (appellant) had performed "dredging of the open waters between these piers and docks approximately every six months." Id. at 390, n. 3.
In this case, the City points to the footnoted reference to dredging in Jacksonville Shipyards to support the proposition that dredging is a permanent improvement. However, we agree with the conclusion of the Fourth District below that

Jacksonville Shipyards illustrates the anomaly of characterizing submerged, dredged land as being a permanent improvement. The opinion indicates that the open waters between the piers and docks were dredged about every six months. After dredging, the shifting waters and currents made the condition of submerged lands anything but permanent.
West Palm Beach, 714 So.2d at 1065 (citation omitted). Thus, we disapprove Jacksonville Shipyards to the extent that it conflicts with this opinion.
In Key West, the Third District held that "where dredging is concerned, the determination of what constitutes an `improvement' must be determined on a case-by-case basis." 683 So.2d at 146. The district court based this holding upon its conclusion that a pier is certainly a permanent improvement under the Butler Act and "it seems that a pier would be, for the most part, useless without some incidental dredging." Id. at 145. In this case, the Fourth District below rejected the Third District's case-by-case determination as "too amorphous a standard by which to decide the issue of title to irreplaceable submerged land within the public trust." West Palm Beach, 714 So.2d at 1066. Concerning any stated dredging necessity, the Fourth District found that "incidental dredging to keep the marina functional would not be precluded," id., by state ownership of the subject dredged bottomlands because the Board has conceded that the City has the right to use the Palm Harbor Marina and "the waters around their docks," and "when the Butler Act was in effect the state freely granted upland owners permission to dredge on the condition that the public retained its right to the open waters." Id. at 1066 n. 5.
We agree with the Fourth District's rejection of the case-by-case standard provided in Key West and its characterization of the Third District's analysis as "too myopic, looking no further back in time for authority than Jacksonville Shipyards." Id. at 1065. Therefore, we disapprove the holding in Key West that would allow in some cases the divestiture of state submerged *1092 lands solely because these bottomlands have been dredged.

CONCLUSION
Accordingly, we approve the decision of the Fourth District Court of Appeal below. We disapprove Jacksonville Shipyards and Key West to the extent that they conflict with this opinion.
It is so ordered.
HARDING, C.J., and SHAW, ANSTEAD, LEWIS and QUINCE, JJ., concur.
PARIENTE, J., recused.
NOTES
[1] Ch. 8537, Laws of Fla. (1921), formerly § 271.01, Fla.Stat., prior to its repeal in 1957.
[2] Ch. 791, Laws of Fla. (1856).
[3] Ch. 57-362, § 9, Laws of Fla. (codified at § 253.129, Fla.Stat. (1997)). In 1951, the legislature repealed the Butler Act except as to Dade and Palm Beach Counties. Ch. 51-26776, Laws of Fla. (codified at § 253.129, Fla.Stat. (1997)).