748 So.2d 1061 (1999)
ANDERSON COLUMBIA COMPANY, INC., Panhandle Land & Timber Company, Inc., Support Terminals Operating Partnership, L.P., and Commodores Point Terminal Corporation, Appellants,
v.
BOARD OF TRUSTEES OF the INTERNAL IMPROVEMENT TRUST FUND OF the STATE OF FLORIDA, Appellee.
Nos. 98-3082, 98-3299.
District Court of Appeal of Florida, First District.
December 22, 1999.
Rehearing Denied February 1, 2000.
*1062 Kenneth G. Oertel and Timothy P. Atkinson of Oertel, Hoffman, Fernandez & Cole, P.A., Tallahassee, for Anderson Columbia Company, Inc. and Panhandle Land & Timber Company, Inc.
Daniel D. Richardson of LeBoeuf, Lamb, Greene & Macrae, L.L.P, Jacksonville, for Support Terminals Operating Partnership, L.P., and Commodores Point Terminal Corporation, for Appellants.
F. Perry Odom and Suzanne B. Brantley of Department of Environmental Protection, Tallahassee, for Appellee.
LAWRENCE, J.
Anderson Columbia Company, Incorporated, Panhandle Land & Timber Company, Incorporated, Support Terminals Operating Partnership, Limited Partnership, and Commodores Point Terminal Corporation (appellants) challenge an administrative order entered on petitions contesting the validity of a proposed rule published by the Board of Trustees of the Internal Improvement Trust Fund of the State of Florida (agency).[1] An administrative law *1063 judge declared invalid one portion of the rule, but declared valid the remaining portions of the rule, and denied the petitions in all other respects. We reverse, concluding that the proposed rule is an invalid exercise of delegated legislative authority.
The issue in this case necessarily involves the public trust doctrine. In the final analysis however, an equally important issue is whether the public may rely on the trustworthiness of the state to keep its part of a bargain in agreeing, under certain conditions, to convey sovereign submerged lands to upland owners who improved the lands during a period of 102 years in our state's history.
The Florida legislature, in 1856, enacted the Riparian Act, in which the State of Florida "divested" itself of:

[A]ll right, title and interest to all lands covered by water, lying in front of any tract of land owned by a citizen of the United States ... lying upon any navigable stream ... as far as to the edge of the channel, and [the state] hereby vest[s] the full title to the same in and unto the riparian proprietors, giving them the full right and privilege to build wharves ... and to fill up from the shore, bank or beach, as far as may be desired, not obstructing the channel, but leaving full space for the requirements of Commerce, and upon lands so filled in, to erect warehouses or other buildings... also confirming to the riparian proprietors all improvements which may have heretofore been made upon submerged lands, for the purposes within mentioned.
Ch. 791, § 1, Laws of Florida (1856)(emphasis added).
The 1856 Riparian Act was repealed in 1921, and replaced by the Butler Act; the Butler Act was made retroactive to the date of adoption of the Riparian Act of 1856. The Butler Act similarly granted to upland or riparian owners "full title" to the submerged lands which were and thereafter filled in, bulkheaded, or "permanently improved," and specifically included "warehouses, dwellings or other buildings." The vesting of title was contingent upon the actual filling in of the submerged lands or erection of permanent improvements over submerged lands. The Butler Act however added language not included in the 1856 Riparian Act, which made such conveyances "subject to any inalienable trust under which the State holds said lands." Ch. 8357, at 332, Laws of Fla. (1921).
The 1856 Riparian Act and the Butler Act, during the period spanning 1856 to 1957, accomplished their intended purpose, as this court noted in Jacksonville Shipyards, Inc. v. Department of Natural Resources, 466 So.2d 389, 391 (Fla. 1st DCA 1985):
The Butler Act, adopted in 1921 to cure and replace the Riparian Act of 1856, was made effective as of December 27, 1856, the date of the prior Act. Like the earlier Act, the Butler Act had as its major objective the creation or evolution of commerce in connection with the ports of the State. Another purpose was to encourage upland owners to improve their waterfront property as specified in the Act.
(Footnotes omitted.) Many persons and business entities filled in, bulkheaded, and made permanent improvements with respect to sovereign submerged lands in reliance on these legislative acts. Appellants, or their predecessors in title, are among those who complied therewith. The qualifying conditions were met by some of the appellants under the 1856 Riparian Act, and some after adoption of the 1921 Butler Act (as noted, made retroactive to 1856).
The Butler Act was repealed in 1957 by Chapter 57-362, Laws of Florida, the Bulkhead Act. The Bulkhead Act, section 9, was codified as section 253.129, Florida Statutes (1957), which provides: "The title to all lands heretofore filled or developed is herewith confirmed in the upland owners *1064 and the trustees shall on request issue a disclaimer to each such owner." The agency began issuing disclaimers in 1957, pursuant to section 253.129, to those upland owners who had "filled in" or "bulkheaded" their submerged lands. The agency, since that time, has issued more than one hundred disclaimers, all without any reservations or conditions.
The agency, in 1984 however, declined to issue an unconditional disclaimer to Jacksonville Shipyards, Incorporated, for its piers, docks, wharves, dry docks, and railroad trestles, which were constructed prior to 1951. The Board recited as its ground for denial, the fact that the submerged lands were not "filled in." This court disagreed and held that:
The plain language of the Butler Act provides for acquisition of title to submerged lands by bulkheading, filling, or permanently improving. The DNR Rule, purporting to require that the upland owner have filled the submerged land in order for the owner to apply for disclaimer confirming title, is in derogation of the statute and therefore invalid.
Jacksonville Shipyards, 466 So.2d at 393 (emphasis added) (footnote omitted).[2] Despite this court's holding in Jacksonville Shipyards, in the words of the agency's DEP division director who testified in the instant case, the agency "resisted" following the decision in that case. In fact, the agency's current rule still requires that an applicant can qualify for a disclaimer only if the owner's lands are "filled in."
The agency, between 1985 and 1993, issued at least five unconditional disclaimers on lands which were not "filled in," but upon which lands were constructed docks, piers, or dredging. Four of the five disclaimers however were issued only after a full administrative hearing in which the agency asserted its position that only "filled in" lands could qualify. The agency pursued these adverse administrative rulings no further. One additional unconditional disclaimer was issued by the agency, but only following a judicial mandate in Department of Natural Resources v. Industrial Plastics Technology, Inc., 603 So.2d 1303 (Fla. 5th DCA 1992). The Industrial Plastics court held that a wooden dock and boat house built by a residential riparian owner was sufficient to constitute a permanent improvement as contemplated by the 1856 Riparian Act and the 1921 Butler Act.
The proposed rule at issue in the order before us is the agency's first attempt since the Jacksonville Shipyards case to publish a rule addressing a disclaimer regarding permanent improvements to sovereign submerged lands. The proposed rule however, contrary to Jacksonville Shipyards, includes this language:
2. Lands below mean or ordinary high water line which were filled in, bulkheaded, or permanently improved prior to the applicable date under subsection (1)(a), above, but which are no longer filled in, bulkheaded, or permanently improved in whole or in part, when application is made, shall not qualify for a disclaimer under this rule.

*1065 3. Title to lands which are no longer filled in, bulkheaded, or permanently improved, and therefore no longer comply with the Butler Act shall be claimed by the Board of Trustees as part of the Public Trust. This includes lands which have subsequently eroded due to natural causes. Applications for disclaimers for such lands shall be denied.

. . . .
11. Submerged lands to be disclaimed shall be subject to the inalienable Public Trust. Such lands shall be available for the traditional public uses of fishing, swimming, and boating.
(Emphasis added.)
The proposed rule also requires that a disclaimer issued by the agency conform with Form 63-035(16) which contains the following limiting language, in contravention of Jacksonville Shipyards:
All lands within the above-described area which are submerged at the time of this grant shall be subject to the inalienable public trust. Such lands shall be available for the traditional public uses of fishing, swimming, and boating.
NOTICE: If at any time or for any reason, the lands described herein are no longer bulkheaded or filled in or permanently improved, and said lands are no longer being used or intended to be used for the purposes contemplated by the Butler Act, Grantor shall have the right to reclaim all right, title and interest in and to said lands as part of the public trust lands.
The agency suggests that the legislature is without authority to convey sovereign lands absolutely, and that any conveyance must be subject to the public trust. The Florida Supreme Court long ago rejected this suggestion however when it said:
These acts, together with the act here under attack, evidence a public policy established under legislative authority, beginning as far back as 1856, under which the state may part with the title to certain portions of its lands under navigable waters, of the kind and under the conditions described in the statutes, which policy and authority cannot be lightly disregarded by the courts.
Pembroke v. Peninsular Terminal Co., 108 Fla. 46, 69, 146 So. 249, 257 (1933).
The agency also argues that the language added to the Butler Act, that is, "subject to any inalienable trust under which the State holds said land," allows it to claim title to submerged lands by refusing to issue disclaimers requested by applicants, or by alternatively issuing a qualified disclaimer. This language of the Butler Act was examined by our supreme court in Holland v. Fort Pierce Financing & Construction Co., 157 Fla. 649, 656-58, 27 So.2d 76, 80, 81-82 (1946):
The riparian act of 1921 vests in the riparian owner, i.e., the owner of upland extending to high water mark on any navigable stream, bay of the sea or harbor, title to the submerged area from the high water mark in direction of but only to the edge of the channel, but the title thus vested is a qualified one, which will become absolute when and if the upland owner shall actually bulkhead and fill in from the shore.
The only limitation placed upon the riparian proprietor is that in the exercise of the right granted by the Act he shall so construct the improvement authorized as not to obstruct the channel and that full space shall be left for the requirements of commerce.
When a riparian owner bulkheads and fills in the submerged area in the manner and within the limitation specified in the riparian Act of 1921 the title to the filled in land becomes absolute and equal to that of the upland.

. . . .
We cannot agree with the appellant's contention that appellee's improvement of the area involved, and its subsequent use amounted to a transgression of the inalienable trust doctrine. We think the *1066 test in cases of this kind is: That if the grant of sovereignty land to private parties is of such nature and extent as not to substantially impair the interest of the public in the remaining lands and waters it will not violate the inalienable trust doctrine.
That appellee bulkheaded and filled in toward the channel of the river is not denied. The proof shows that ample space was left for the purpose of navigation and for the requirements of commerce, and that the paramount authority of the federal government was obtained for the construction of the improvement. The appellee having proceeded in accordance with the requirements of the riparian Act of 1921, its title to and possession of the land so bulkheaded and filled in became as valid and indefeasible as that of its upland.

(Citations omitted and emphasis added.)
The supreme court, in 1956, again made clear that the public trust doctrine does not impose a limitation upon the two statutes at issue when the conditions of the statutes are met, holding:
Despite the language of the Butler Bill that the grant therein was made "subject to any inalienable trust under which the state holds all submerged lands and water privileges within its boundaries," this Court knows, since everyone knows it, that the Butler Bill has operated to divest the State of its sovereign lands just as effectively as though a grant thereof without such limitation had been made to a riparian owner.

Trustees of Internal Improvement Fund v. Claughton, 86 So.2d 775, 786 (Fla.1956) (emphasis added).
The provisions of the proposed rule recited above are inconsistent with fee simple title because the provisions impose limitations and conditions upon the agency's disclaimer of lands which have been "filled in, bulkheaded, or permanently improved... but which are no longer filled in, bulkheaded, or permanently improved." The proposed rule uses language such as "shall not qualify," "applications ... shall be denied," "lands to be disclaimed shall be subject to the inalienable Public Trust." The proposed rule further seeks to retain public use ("fishing, swimming, and boating") of lands qualifying for disclaimer. The net effect of these limitations and conditions is clearly an unauthorized attempt on the part of the agency in some instances to create a reversionary interest in the state, and in other instances to confirm less than fee simple title with respect to lands qualifying under either the 1856 or 1921 riparian acts.
Our supreme court recently considered the application of the 1856 Riparian Act and 1921 Butler Act in City of West Palm Beach v. Board of Trustees of the Internal Improvement Trust Fund, 746 So.2d 1085 (Fla.1999). Although the broad issue was whether the upland owner acquired fee simple title to sovereignty lands under open water simply by dredging alone, the opinion is instructive in considering the instant case. Interestingly enough, the agency conceded in that case that the upland owner was entitled to the submerged lands immediately beneath its piers/docks (the footprints). The trial court confirmed "fee simple ownership" in the upland owner and thus required the agency to issue an unqualified disclaimer. The agency's position on this point in City of West Palm Beach is inconsistent with its instant proposed rule, because the proposed rule seeks to confirm less than fee simple title in qualifying upland owners.
Any doubt as to the quality of the title obtained by qualifying upland owners has been removed by the decision in City of West Palm Beach:
The Butler Act granted owners exclusive rights only over those parcels of submerged land underneath the foundations for wharves or "permanent" structures or which were filled in and used for the construction of "warehouses, dwellings, or other buildings." Only such land is "actually ... permanently *1067 improved" within the meaning of the statute.
This reading of the statute harmonizes with section eight of the Act, which head Act. provides that nothing in the statute shall be construed to prohibit the public from boating, bathing, fishing or exercising "privileges" previously allowed as to the submerged land, "until such submerged lands shall be filled in or improved by the riparian owners as herein authorized." Ch. 8537, § 8, at 334, Laws of Fla. (1921).
Id. at 1090 (emphasis added). The supreme court furthermore has described the quality of the title vesting in riparian owners who comply with the acts in issue as "fee simple title." Duval Eng'g & Contracting Co. v. Sales, 77 So.2d 431, 433 (Fla.1954).
The agency argues that the status or condition of a permanent improvement at the time of application for a disclaimer determines whether a disclaimer will issue. The agency further argues that despite the initial issuance of a disclaimer, title may be reclaimed by the state in the event a permanent improvement disappears or significantly erodes. We disagree. The agency's position is inconsistent with the riparian statutes and the concept of fee simple title. Upland owners who met the statutory requirements under the 1856 Riparian Act or the 1921 Butler Act during the applicable time period became immediately vested with fee simple title. The state cannot now by rule or refusal to issue an unqualified disclaimer regain or reclaim any interest in the affected lands. To permit such state action would constitute an unlawful forfeiture of private property rights without just compensation.
When the 1957 Legislature enacted the Bulkhead Act requiring the agency to issue a disclaimer to qualifying upland owners, it apparently recognized the need of upland owners to obtain record evidence of their ownership interest, without which it would be virtually impossible to convey marketable title to a subsequent purchaser or to obtain title insurance on the subject lands. The agency's proposed rule would defeat this significant purpose of the Bulkhead Act.
The riparian acts and the opinions of the supreme court, as well as this court, in describing the kind of title acquired by riparian owners of uplands who complied with the statutory conditions, have employed the terms: "absolute and equal to that of the upland," "all right, title and interest," "full title," "exclusive rights," "as valid and indefeasible as that of its upland," "fee simple ownership," and "fee simple title." We find these terms as used to be equivalent to fee simple title. Fee simple title is a descriptive term in the law of real property and has been defined by our supreme court as "the highest quality of estate in land known to law." State v. Jacksonville Expressway Auth., 139 So.2d 135, 138 (Fla.1962).
The legislature, when it enacted section 253.129 in 1957, imposed no conditions or limitations on the disclaimers to be issued to riparian owners who had complied with the acts during their effective dates. In view of the plain language of the several legislative acts, as well as the various judicial holdings, we are unable to discern how the agency can on its own initiative claim what amounts to a reversionary interest and seek to reserve ownership interests by issuing less than an unqualified or unconditional disclaimer to riparian lands which meet the statutory requirements. We therefore hold the agency's rule to be an invalid exercise of delegated legislative authority.
We hence reverse the order below, and remand for consistent proceedings.
REVERSED.
ALLEN, J., CONCURS and BENTON, J., CONCURS WITH WRITTEN OPINION.
*1068 BENTON, J., concurring.
The provisions of rule 18-21.019(1) proposed by the Board of Trustees of the Internal Improvement Trust Fund (the Trustees) and quoted in the majority opinion do not comport with the Butler Act, Ch. 8537, Laws of Fla. (1921), and the Riparian Act of 1856, Ch. 791, Laws of Fla. (1856), which the courts have construed to authorize estates in fee simple. Nor do they faithfully implement section 253.129, Florida Statutes (1999), which provides:
The title to all lands heretofore filled or developed is herewith confirmed in the upland owners and the trustees shall on request issue a disclaimer to each such owner.
Although a rule must "implement or interpret the specific powers and duties granted by the enabling statute," § 120.52(8), Fla. Stat. (1999), the rule the Trustees proposed directs that, upon request for a disclaimer confirming titleeven as to lands concededly conveyed into private ownershipcertain rights should be asserted or "reserved" instead of being disclaimed. The statute contemplates a disclaimer of all right, title, and interest.
On the other hand, tracing title to the Butler Act or the Riparian Act of 1856 does not immunize the holder from the perils inherent in owning waterfront property. Not least among these is erosion, which has different legal consequences depending on whether it is gradual or avulsive. See, e.g., Kissinger v. Adams, 466 So.2d 1250 (Fla. 2d DCA 1985). Gradual
erosion or submergence is accretion in reverse, and the imperceptible principle is applicable in distinguishing erosion from avulsion. In other words, where the loss occurs through avulsion, which is defined as the sudden or violent action of the elements, and the effect and extent of which is perceptible, the boundaries do not change. But where the sea, lake, or navigable stream imperceptibly encroaches upon the land, the loss falls upon the owner, and the land thus lost by erosion returns to the ownership of the State.
Municipal Liquidators, Inc. v. Tench, 153 So.2d 728, 730-31 (Fla. 2d DCA 1963). Accord Schulz v. City of Dania, 156 So.2d 520 (Fla. 2d DCA 1963). The proposed rule would treat even avulsive resubmersion as a divestiture of upland owners' former sovereignty lands. This is at odds with the venerable teaching "that boundaries do not change in such circumstances." Siesta Properties, Inc. v. Hart, 122 So.2d 218, 224 (Fla. 2d DCA 1960). See Bryant v. Peppe, 238 So.2d 836 (Fla. 1970); 2 William Blackstone, Commentaries *262 ("the quantity of ground gained, and the time during which it is gaining, are what make it either the king's or the subject's property").
It is now clear that the proposed rule defines "permanently improved" too broadly when it includes "submerged lands adjacent to, and used as adjuncts to, piers or docks...." The recent decision in City of West Palm Beach v. Board of Trustees of the Internal Improvement Trust Fund, 746 So.2d 1085 (Fla.1999), fully vindicates any "resistance" the Trustees offered to the proposition that mere dredging conferred ownership rights of any kind. West Palm Beach makes it clear that dredged bottoms, unless within the footprint of a permanent structure, have not been "developed" within the meaning of section 253.129, Florida Statutes (1999), and therefore remain sovereignty lands.
It is also clear that the proposed rule requires substantial reworking, and I join the judgment of the court on that basis.
NOTES
[1] Section 253.002, Florida Statutes (1997), provides that the Department of Environmental Protection (DEP) shall perform staff duties for the Board of Trustees of the Internal Improvement Trust Fund (agency). Thus, DEP acts on behalf of the agency in promulgating rules. All of the duties and authority previously vested in the Department of Natural Resources was transferred to DEP in 1993.
[2] This court's opinion in Jacksonville Shipyards was recently discussed by the supreme court in City of West Palm Beach v. Board of Trustees of the Internal Improvement Trust Fund, 746 So.2d 1085 (Fla.1999). In responding to the appellant's argument that Jacksonville Shipyards supported its position that dredging constitutes a permanent improvement, the supreme court said:

The First District did not directly address the issue as to whether dredging of submerged lands constituted a permanent improvement. The only mention of dredging in Jacksonville Shipyards was in a footnote in which the district court noted that the record indicated among a list of various "improvements" that Jacksonville Shipyards, Inc. (appellant) had performed "dredging of the open waters between these piers and docks approximately every six months."
Id. at 1091. The supreme court disapproved Jacksonville Shipyards only to the extent that it might be read to be in conflict with its holding that dredging beneath open waters did not constitute a permanent improvement.